**EXXON SHIPPING COMPANY,**
**A Delaware Corporation,**
**Plaintiff,**

**v.**

**EXXON SEAMEN'S UNION, Defendant.**

**Civ. A. No. 91–2471 (AJL).**

United States District Court,
D. New Jersey.

Feb. 14, 1992.

---

**9.** For explanations why neither Martin nor Pennick are able to bring suit on any earlier claims, *supra.*

Douglas B. Neagli, Albert R. Galik, Houston, Tex., Richard R. Cerbone, Florham Park, N.J., for plaintiff.

Howard A. Goldberger, West Orange, N.J., for defendant.

## OPINION

LECHNER, District Judge.

Currently before the court is the motion of plaintiff Exxon Shipping Company ("Exxon") for summary judgment to vacate an arbitration award (the "Arbitration Award") in favor of the Exxon Seamen's Union ("Union") which required Morris Foster ("Foster"), an able-bodied seaman and helmsman employed by Exxon, to be reinstated to rather than discharged from employment.[1] Jurisdiction is alleged pursuant to section 301 of the Labor Manage-

ment Relations Act, 29 U.S.C. § 185, and appears to be appropriate.

For the reasons set forth below, the Arbitration Award is vacated. Exxon's request for attorney's fees is denied.

*Facts*

Exxon is a Delaware corporation with its principal place of business in Texas. Facts Statement at B(1). Exxon operates American flag ships and other vessels on the high seas and the inland water ways of the United States. *Id.* The Union is an unincorporated labor organization representing "all unlicensed personnel employed in the Deck, Engine, and Stewards Departments of Exxon Shipping's vessels." *Id.* at B(2).

One of the ships operated by Exxon was the Exxon Wilmington (the "Exxon Wilmington"), a 635–foot ocean-going tanker. *Id.* at B(11). The Exxon Wilmington is a specialty oil tanker which carries specialty products such as refined lube oils and gasoline. Pl.'s Br. at 4. "The primary route of the Exxon Wilmington is ... from refineries in Baton Rouge, Louisiana to various ports along the Eastern seaboard, including three ports in the State of New Jersey." Facts Statement at B(11); Titus Aff., ex. J. Foster was the helmsman of the Exxon Wilmington. Facts Statement at B(10).

On 31 July 1985, Exxon and the Union entered into a Collective Bargaining Agreement (the "Agreement") concerning the "wages, hours and other terms and conditions of employment of those employees [for whom] the Union had been certified as the exclusive bargaining representative." *Id.* at B(3); Complaint, ¶ 5. Article IV of the Agreement contains provisions regarding the discipline of the represented employees. Article V of the Agreement contains grievance and arbitration procedures. Facts Statement at B(4); Complaint, ¶ 6 and ex. A. The provisions regarding the arbitration of disputes provide in pertinent part:

---

1. In support of its motion Exxon submitted the following: Brief in Support of Plaintiff Exxon Shipping Company's Motion for Summary Judgment ("Pl.'s Br."); Reply Brief to Defendant's Opposition to Plaintiff Exxon Shipping Company's Motion for Summary Judgment ("Pl.'s Reply"); Affidavit of Timothy R. Titus, Jr. ("Titus

Aff."); Plaintiff Exxon Shipping Company's Statement of Material Facts Not in Dispute (the "Facts Statement").

In opposition to the motion, the Union submitted: Brief in Opposition to Plaintiff's Motion for Summary Judgement ("Def.'s Br.").

C. The decision of the majority of the said Board of Arbitration shall be final and binding upon the employee, [Exxon] and the [Union], and shall conclusively determine the same not to exceed the life of this Agreement.

. . . .

E. If either party refuses to arbitrate under the conditions set forth above, or after arbitration, refuses to abide by the decision heretofore prescribed, the other party may pursue its lawful remedies.

Complaint, ex. A; Titus Aff., ex. I.

On 1 April 1988, the Agreement was modified by the implementation of several proposals. Among the proposals implemented was a Policy on Alcohol and Drug Use (the "Drug Policy") with corresponding guidelines (the "Guidelines"). Facts Statement at B(5); Complaint, ¶ 7. Where cause exists, the Drug Policy required employees to submit to medical evaluation or alcohol and drug testing. Under the Drug Policy, a positive test result for drugs is a ground for disciplinary action, including termination. Facts Statement at B(6); Complaint, ¶ 8. Prior to the effectuation of the Drug Policy and Guidelines, Foster and other Exxon employees received a copy of the Drug Policy and Guidelines by letter, dated 29 March 1988 (the "29 March 1988 Letter"). Facts Statement at B(6).

Exxon explained the Drug Policy by sending out a letter on or about 27 September 1988 (the "27 September 1988 Letter") regarding its intent to implement more stringent enforcement procedures for the Drug Policy. Exxon sent the letter to all "ocean going" employees, including Foster, to ensure the employees were aware of the Drug Policy and the more stringent enforcement procedures it intended to implement. Facts Statement at B(7); Complaint, ¶ 9.

In the 27 September 1988 Letter, Exxon informed the employees that termination would be the standard penalty for the violation of the Drug Policy. According to Exxon, the letter served as:

another official notice that *violation of the Company Alcohol and Drug Use Policy,* or regulations governing alcohol or drug use in the work place *will result in immediate termination from the vessel.* Although we must continue to thoroughly investigate the facts of each individual case and make a final determination on a case by case basis, *termination of employment is the penalty for violation of these standards.*

Facts Statement at B(7) (emphasis added). The Union did not file a grievance or unfair labor practice charge protesting the Drug Policy or its implementation. Pl.'s Br. at 2.

The first opportunity for the implementation of the Drug Policy enforcement procedures, as explained in the 27 September 1988 Letter, occurred about eight months later when, on 7 April 1989, the Exxon Wilmington ran aground in the Mississippi River in Louisiana.[2] Facts Statement at B(9); Complaint, ¶ 10. In order to determine whether the accident was drug-related, several drug tests of ship personnel were conducted.

Pursuant to the Drug Policy and a request by the United States Coast Guard (the "Coast Guard"), Exxon performed several drug and alcohol tests on the captain, the mate on watch and the helmsman, Foster. Facts Statement at B(10). For the test mandated by the Coast Guard, Exxon hired Global Safety and Security Company ("Global") to collect urine specimens. *Id.* at B(12). Global collected the samples and sent them to Roche Biomedical Laboratories ("Roche") for processing. *Id.*

For the tests conducted pursuant to the Drug Policy, Exxon collected a urine specimen at the same time from each of the same three crew members. These samples were sent to the American Institute for Drug Detection (the "AIDD") for processing. *Id.* at B(13).

Because of the different screening levels used by the Coast Guard and Exxon, the drug tests on Foster's samples yielded different results. The Coast Guard uses a 100 ng/ml screening level on the Enzyme

---

**2.** This accident followed the 24 March 1989 accident by the Exxon Valdez which ran aground in Prince William Sound and caused a major oil spill. Facts Statement at B(8).

Multiplied Immunoassay Technique ("EMIT") test. If the test is positive, a 15 ng/ml confirmation level is used on the Gaschromatography/Mass Spectrometry ("GCMS") test.[3] *Id.* at B(14); 40 C.F.R. § 40.29. On 11 April 1989, based on the 100 ng/ml screening level, the samples tested negative by Roche and no confirmatory test was performed. Facts Statement at B(15).

Exxon's Drug Policy provides for a lower screening level at 20 ng/ml on the EMIT test and a 10 ng/ml confirmatory level using the GCMS test. *Id.* at B(14). On 13 April 1989, based on the 20 ng/ml screening level, Foster's specimen was tested positive by AIDD. *Id.* at B(16).

On 14 April 1989, Exxon requested Roche conduct another set of tests on Foster's specimen. Titus Aff., ex. A at 2. Roche conducted a confirmatory test using the GCMS method. On 17 April 1989, because the test results measured 31 ng/ml, Roche reported the specimen tested positive for cannabinoids.[4] Facts Statement at B(17). Based on the positive test results, Exxon discharged Foster effective 17 April 1989. *Id.* at B(18); Complaint, ¶ 11.

The Union filed a grievance procedure protesting the discharge. Unable to resolve the matter through the grievance procedures, the Union demanded arbitration. Facts Statement at B(19); Complaint, ¶ 12.

Arbitration hearings were held on 23 January 1990 and 8 August 1990 at the Holiday Inn/Jetport in Elizabeth, New Jersey. "Both sides appeared and offered oral and documentary evidence." Facts Statement at B(20); Complaint, ¶ 13.

On 13 March 1991, the Board of Arbitrators (the "Arbitration Board")[5] unanimously found Foster had used marijuana and had tested positive for the drug. Facts Statement at B(21); Complaint, ¶ 13. The Arbitration Board found reasonable cause existed to test Foster because of the Coast Guard regulations which require testing of persons involved in a "serious marine incident" or "marine casualty." Pl.'s Br. at 7. The Arbitration Board also found testing was proper because of the "potential risk to other employees, the environment, and the public." *Id.* (citation omitted). The Arbitration Board found it significant that Foster was not singled out for testing and that all persons on the bridge at the time of the accident were tested. *Id.*

The Arbitration Board concluded the positive test results subjected Foster to discipline. Facts Statement at B(21). The Arbitration Board held, however, that "[d]ischarging Foster would be excessive." Titus Aff., ex. A at 20. Instead of discharge, the Arbitration Board determined Foster should be reinstated to his former position without back pay. *Id.*, ex. A at 21. At the time of the Arbitration hearings, Foster had been terminated, without pay, for almost two years. Pl.'s Br. at 8 n. 6. Additionally, the Arbitration Board held Foster could be randomly tested for drugs for a period not to exceed one year from his return to work to ensure Foster was complying with the Drug Policy. Titus Aff., ex. A at 21.

3. According to Exxon:

[T]he GCMS method test[s] only for the specific cannabinoid which is the active ingredient in marijuana. The EMIT tests for *all* cannabinoids.

Pl.'s Br. at 6 n. 3.

4. According to Exxon, Foster would have failed, or tested positive, on the Coast Guard's 15 ng/ml confirmatory GCMS test:

Exxon Shipping's expert testified that the cannabinoid appearing on the GCMS test makes up only 20–30% of the "total" cannabinoids. Thus, a 20 ng/ml positive test on the GCMS is comparable to a 60 to 100 ng/ml positive test on the EMIT. Accordingly, Foster's 31 ng/ml positive GCMS test showed that he was perilously close to the 100 ng/ml Coast Guard screening level.

Pl.'s Br. at 6 n. 3.

5. Pursuant to the Agreement, the Arbitration Board was chosen as follows:

One (1) member to be chosen by the [Union] and one (1) member to be chosen by [Exxon]. These two shall meet within forty-eight (48) hours after receipt of written notice from either party (Saturdays, Sundays, and holidays excluded), and at that meeting shall select a third member. If they cannot agree upon a third member, he shall be designated by the American Arbitration Association.

Titus Aff., ex. I at 8.

On 10 June 1991, Exxon filed the Complaint alleging that the "award rendered by the Arbitrat[ion Board] is wholly void because [it] exceeded [its] power with respect to the interpretation and application of the provisions of the Collective Bargaining Agreement as well as Exxon Shipping's Policy on Alcohol and Drug Use." Complaint, ¶ 14. Exxon requested an order vacating the Arbitration Award on the ground that the Arbitration Board exceeded its powers and granting costs, attorney's fees and other relief to which Exxon may be entitled. *Id.* at 5.

*Discussion*

A. Summary Judgment Standard of Review

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist; a district court may not, however, resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Boyle v. Governor's Veterans Outreach & Assistance Center,* 925 F.2d 71, 75 (3d Cir. 1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Joseph v. Hess Oil,* 867 F.2d 179, 182 (3d Cir.1989). " 'Any 'unexplained gaps' in material submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll–Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502

(3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12), *cert. denied,* —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of com-

ing forward with *specific* facts evidencing a need for trial. *see* Fed.R.Civ.P. 56(e); *see also Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case"); *Carlson v. Arnot-Ogden Memorial Hosp.*, 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor").

### B. Reviewing Arbitration Awards

The parties stipulated to the following issues for arbitration: (1) was the discharge of Foster for just cause and (2) if not, what is the appropriate remedy. Titus Aff., ex. A at 4. The Arbitration Board concluded Foster did not violate paragraph one of the Drug Policy, but did violate paragraph four of the Drug Policy. Accordingly, the Arbitration Board decided there was just cause to discipline Foster but that discharge as a remedy was excessive. *Id.* at 21. The Arbitration Board recommended reinstatement without backpay and random testing for a one year period. *Id.*

Exxon argues the Arbitration Award should be vacated because the Arbitration Board exceeded the scope of its authority in refusing to support the discharge of Foster and because the Arbitration Award violates public policy.

### 1. *The Scope of Arbitration Authority and the Arbitration Board Findings*

■ Courts play a limited role in reviewing arbitration awards. *United Paper-*

*workers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). "As long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his [or her] own brand of industrial justice,' the award is legitimate." *Id.* (quoting *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)); *see also Eichleay Corp. v. International Ass'n of Bridge, etc.*, 944 F.2d 1047, 1050 (3d Cir. 1991), *petition for cert. filed*, 9 Dec. 1991. Neither a court's disagreement with the arbitrator's construction of a contract nor its belief that its interpretation of a contract is better justifies a court overruling the arbitrator. *Eichleay Corp.*, 944 F.2d at 1056; *News America Publications, Inc. Daily Racing Form Division v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir.1990) ("*News America Publications I*") (citations omitted).

Deference to arbitration awards serves to "protect the benefits of labor arbitration, namely, speed, flexibility, informality and finality." *Penntech Papers, Inc. v. United Paperworkers Int'l Union*, 896 F.2d 51, 53 (3d Cir.1990). The high level of deference is also supported by the preference expressed in federal statutes governing labor-management relations for the private resolution of labor disputes. *Tanoma Mining Co. v. Local Union No. 1269, United Mine Workers*, 896 F.2d 745, 747 (3d Cir.1990).

■ "As long as the arbitrator has *arguably* construed or applied the contract, the award must be enforced, regardless of the fact that a court is convinced that arbitrator has committed a serious error." *Id.* (emphasis in original). There must be no support whatsoever in the record justifying the arbitrator's decision for a court to deny enforcement of the award. *Id.*

■ The instances in which a court can vacate an arbitration award are narrow. *Id.* at 748. The vacating of an arbitration award is justified where an arbitra-

tor has ignored the plain language of the contract or if the arbitrator's decision is unsupported by principles of contract construction. *News America Publications v. Newark Typographical Union, Local 103,* 921 F.2d 40, 41–42 (3d Cir.1990) (*"News American Publications II"*). Vacating an award is also proper if the award does not draw its essence from the collective bargaining agreement, *Tanoma Mining Co.,* 896 F.2d at 747–48, or if the arbitrator substitutes his or her own notions of "industrial justice" for the terms of the collective bargaining agreement. *Pennsylvania Power Co. v. Local Union No. 272 of Int'l Bhd. of Elec. Workers,* 886 F.2d 46, 49 (3d Cir.1989).

In light of the obvious threat of drug and alcohol abuse to the safety and productivity of its employees, the safety of others, the environment and the preservation of its assets, Exxon modified the Agreement to include the Drug Policy and the Guidelines. Exxon employees were informed of the Drug Policy and Guidelines by the 29 March 1988 Letter. In the 29 March 1988 Letter, employees were put on notice that: "A positive test result or refusal to submit to a drug test is grounds for disciplinary action, including dismissal." Complaint, ex. B.[6] The 29 March 1988 Letter also stated: "Being unfit for work because of drugs or alcohol is strictly prohibited and is grounds for termination of employment." *Id.* The 29 March 1988 Letter put the employees on notice that dismissal would follow a positive drug test or being unfit for work because of alcohol or drugs.

Exxon addressed drug and alcohol abuse and the Drug Policy in the 27 September 1988 Letter which again alerted Exxon employees to the Drug Policy that termination would be the standard discipline for a violation of the Drug Policy:

This document [the 27 September 1988 Letter] serves as *another official notice* that violation of the Company Alcohol and Drug Use Policy, or regulations governing alcohol or drug use in the workplace will result in immediate termination from the vessel. While we must continue to thoroughly investigate the facts of each individual case and make a final determination on a case-by-case basis, *termination of employment is the penalty for violation of these standards.*

Titus Aff., ex. G at 3–4 (emphasis added).

Exxon considered the 27 September 1988 Letter to be formal notice of its intent to implement its new discipline policies: "The purpose of this communication is to *ensure* that all employees are aware of the various rules, regulations and company policies regarding substance abuse in the work place and to give notice that enforcement will be more stringent in the future." *Id.* (emphasis added).

According to Exxon, the Arbitration Board exceeded the scope of its authority by failing to consider the 27 September 1988 Letter in making the Arbitration Award. Exxon claims the 27 September 1988 Letter, as a part of the Agreement and the Drug Policy, required the Arbitration Board to uphold the discharge of Foster.

The Union contends the 27 September 1988 Letter was not part of the Drug Policy and therefore was not part of the Agreement to be interpreted by the Arbitration

---

**6.** In the 29 March 1988 Letter, Exxon outlined its reason for the Drug Policy and the Guidelines and what the Drug Policy entailed:

Exxon Shipping Company is committed to a safe, healthy, and productive work place for all employees. The Company recognizes that alcohol, drug, or other substance abuse by a few employees will impair their ability to perform properly and can have serious adverse effects on the safety, efficiency, and productivity of other employees and the Company as a whole. The misuse of legitimate drugs or the use, possession, distribution, or sale of illicit or unprescribed controlled drugs on Company business or premises is strictly prohibited and is grounds for termination. Possession, use, distribution, or sale of alcoholic beverages on Company premises is not allowed without prior approval of appropriate senior management. *Being unfit for work because of use of drugs[ ] or alcohol is strictly prohibited and is grounds for termination of employment.* While this policy refers specifically to alcohol and drugs, it is intended to apply to all forms of substance abuse.
Complaint, ex. B (emphasis added).

Board:[7] "The [27 September 1988] [L]etter represented a unilateral position of [Exxon] as to the disciplinary action it would take under certain circumstances. That position was not binding on the [Union]." Def.'s Br. at 17. However, the Union did not file a grievance or unfair labor practice concerning the Drug Policy or its enforcement, as explained in the 29 March 1988 Letter and the 27 September 1988 Letter.

In the Arbitration Award, the Arbitration Board provided the rationale for the decision that reinstatement without backpay was proper. *See generally* Titus Aff., ex. A. The Arbitration Board analyzed whether Foster violated the Drug Policy by discussing whether Foster violated paragraphs one or four or both one and four of the Drug Policy. As to paragraph one of the Drug Policy, the Board determined:

Paragraph 1 states that "the use, possession, distribution or sale of illicit or unprescribed drugs on Company business of premises is strictly prohibited and is grounds for termination." Under the facts of this case, there is clearly no evidence that Foster was involved in the possession, distribution or sale of illicit or unprescribed drugs. While the positive test results do establish use, ... Paragraph 1 requires that an additional factor be present in order to be in violation of the [Drug] Policy—that use must be *on the Company business or premises.*

Here, there is no proof, whatsoever, that Foster used drugs on Company business or premises. The mere existence of a positive test result does not necessarily establish that Foster used drugs on the Company business or premises. After all, Foster joined the ship from leave nine (9) days before the testing. It is undisputed that marijuana could be present in his system for more than nine (9) days after use.

.... Paragraph 1 further states that "being unfit for work because of use of drugs, or alcohol is strictly prohibited and is grounds for termination of employment." ... In this case, there is no subjective or objective evidence of impairment. There is a lack of subjective evidence in that there is no testimony that Foster was unfit for duty. Nor is there any objective evidence that the level found in Foster's urine establishes impairment. Thus, Foster is not guilty of the final portion of Paragraph 1, either.

*Id.,* ex. A at 15–17 (emphasis in original).

The Arbitration Board, however, found that Foster violated paragraph four of the Drug Policy. Paragraph four of the Drug Policy provides, in pertinent part:

The Company also has the right to require employees to medical evaluation or alcohol and drug testing where cause exists to suspect alcohol or drug use. *A positive test result or refusal to submit to a drug test is grounds for disciplinary action, including dismissal.*

*Id.,* ex. A at 17 (emphasis added).

The Arbitration Board decided Exxon had cause to require Foster to submit to a drug test because of his involvement in a serious marine accident. *Id.,* ex A. at 18. According to the Arbitration Board, the nanograms per milliliter cut-off level employed by Exxon for determining a positive test result was reasonable and therefore proper. *Id.* The Arbitration Board also rejected the Union's arguments that the appropriate "chain of custody" was not followed by the laboratories to ensure the validity of the test results. *Id.,* ex. A at 19.

The Arbitration Board determined that different discipline measures were required depending on whether paragraph one or four of the Drug Policy was violated:

*will impose stronger penalties in the future* ... than it has in the past in order to guarantee that its prohibition against alcohol and habit forming drugs is universally observed...."
*Id.* (emphasis in original) (quoting Brent's decision in another arbitration matter).

7. Exxon pointed out the authority to unilaterally adopt the more stringent discipline policies existed because of a statement made in a prior arbitration award. In the 27 September 1988 Letter, Exxon quoted arbitrator Daniel F. Brent ("Brent") for the following proposition:

"*the Company is entitled to give notice to the bargaining unit and to the Association that it*

Under the plain meaning of Paragraph 4 of the [Drug] Policy, the positive test result subjected Foster to discipline. However, we note that a positive result under Paragraph 4, unlike the use, possession, distribution or sale on Company premises, under Paragraph 1, or impairment at work under the same paragraph, does not specify that discharge shall ensue. Instead, Paragraph 4 of the [Drug] Policy envisions that in certain circumstances an employee who tested positive would be subject to discipline, but not necessarily discharge. After all, the language states "including dismissal." In contrast, Paragraph 1 indicates that a finding of guilt is "grounds for discharge." This demarcation makes good sense. It recognizes the difference between Paragraph 1 and Paragraph 4 offenses.

*Id.*, ex. A. at 19–20.

The Arbitration Board determined discharge was excessive based on several reasons. The Arbitration Board found Foster was not impaired while at work and that he did not use, sell or distribute illicit drugs at work for which discharge is presumed under the Drug Policy. *Id.*, ex. A at 20.

Additionally, the Arbitration Board observed Foster passed the Coast Guard standard for testing positive and that while Foster failed the Exxon standard, the Exxon standard was "quite low." *Id.* The Arbitration Board also noted the Drug Policy emphasized prevention and rehabilitation as its primary purposes rather than discharge. *Id.*

### 2. *Public Policy Reasons for Vacating The Award*

■ Courts may refuse to enforce arbitration awards if the awards are contrary to public policy. *Misco*, 484 U.S. at 42, 108 S.Ct. at 373. "A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in common law, that a court may refuse to enforce contracts that violate law or public policy." *Id.* (citing *W.R. Grace & Co. v.*

*Local Union 759, Int'l Union of United Rubber, etc.*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); *Hurd v. Hodge*, 334 U.S. 24, 34–35, 68 S.Ct. 847, 853, 92 L.Ed. 1187 (1948)).

■ The public policy violated must be an explicit public policy that is "well defined and dominant" and is to be determined "by reference to the laws and legal precedents and not from general considerations of supposed public interests." *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183. Although courts are cautioned to limit the use of general notions of public policy, "the question of public policy is ultimately one for resolution by the courts." *Id.*

After *W.R. Grace*, courts were faced with the task of defining the proper contours of the public policy exception. Because the Courts of Appeals were divided on the question of when courts may set aside arbitration awards on public policy grounds, the Supreme Court granted certiorari in the *Misco* case. The result was a further narrowing of the scope of the public policy limitation: "At the very least, an alleged public policy must be properly framed under the approach set out in *W.R. Grace*, and the violation of such a policy must be clearly shown if an award is not to be enforced." *Misco*, 484 U.S. at 43, 108 S.Ct. at 373. The proper inquiry, moreover, is not on whether the conduct of the employee, which was the subject of the arbitration award, violated public policy. The focus, rather, is on whether the "arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted" would violate the public policy. *Id.* (emphasis in original).

In *Misco*, an employee who worked for a paper converting plant was discharged after marijuana was found in his car on company premises. *Id.* at 34, 108 S.Ct. at 369. After the arbitrator ordered reinstatement, the company filed suit in district court to vacate the arbitration award because it was contrary to public policy. The district court vacated the award and the Court of Appeals affirmed. *Id.* at 35, 108 S.Ct. at 369.

The Supreme Court reversed the Court of Appeals; the Court of Appeals made no attempt to review existing laws and legal precedents to satisfy the *W.R. Grace* requirement of articulating a well defined and dominant public policy. *Id.* at 44, 108 S.Ct. at 374. Even if it had, the Supreme Court observed the Court of Appeals failed to show a clear violation of public policy, which the Court of Appeals characterized as the public policy " 'against the operation of dangerous machinery by persons under the influence of drugs or alcohol.' " *Id.* at 44, 108 S.Ct. at 374 (citation omitted).

According to the Supreme Court, the fact that marijuana was found in the employee's car did not, in itself, violate public policy: "[T]he assumed connection between the marijuana gleanings found in [the employee's] car and [the employee's] actual use of drugs in the workplace is tenuous at best and provides an insufficient basis for holding that his reinstatement would actually violate the public policy identified by the Court of Appeals...." *Id.* Because the fact finding function belonged to the arbitrator, "it was inappropriate for the Court of Appeals itself to draw the necessary inference." Moreover, the Supreme Court observed:

> To conclude from the fact that marijuana had been found in [the employee's] car that [the employee] had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding about [the employee's] use of drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award.

*Id.* at 44–45, 108 S.Ct. at 374.

Despite the *Misco* Court's attempt at refinement, Courts of Appeals have continued to be divided on whether to construe the public policy exception liberally or narrowly. Shortly after *Misco* was decided, the Third Circuit considered the appeal of an order vacating an arbitration award as a violation of public policy. *See United States Postal Serv. v. National Ass'n of Letter Carriers, AFL–CIO*, 839 F.2d 146 (3d Cir.1988). In *National Ass'n of Letter*

*Carriers, AFL–CIO*, the Postal Service discharged a postal employee for firing a gun at his Postmaster's empty parked car while the employee was off-duty. The employee voluntarily confessed to the conduct. Although agreeing that the employee should be disciplined, the arbitrator found no just cause existed for discharging the employee and ordered reinstatement. *Id.* at 147.

On a motion to vacate the award, the district court in the decision below held the award was contrary to public policy. The district court asserted there was a public policy against permitting an employee to " 'direct physical violence at a superior, and an equally compelling policy against forcing that superior to again employ the man.' " *Id.* at 148 (citation omitted). Additionally, it was determined the arbitrator misconstrued the meaning of "just cause" standard in the collective bargaining agreement and that the arbitrator had ignored relevant facts in arriving at his decision. *Id.*

After the district court issued its decision, and before the *National Ass'n of Letter Carriers, AFL–CIO* decision on appeal was announced, the *Misco* decision was decided. The Third Circuit in *National Ass'n of Letter Carriers, AFL–CIO* accordingly applied the *Misco* standard and held the district court exceeded the scope of its reviewing authority. The arbitrator had determined the employee showed no more tendencies for aggression once he returned to work. The Third Circuit determined the district court erred in rejecting the arbitrator's factfinding determination of the employee's " 'amenability to discipline.' " *Id.* 839 F.2d at 149 (citation omitted).

Because the public policy articulated in *National Ass'n of Letter Carriers, AFL–CIO* concerned the protection of the employee's co-workers and customers from the employee's violent conduct, and because the arbitrator determined that no such danger existed, the "policy ... [did] not require [the employee's] discharge for its fulfillment." *Id.* at 149–50. The district court erred in "second-guessing the arbitrator's fact-finding and construction of

the 'just cause' standard for discharge under the collective bargaining agreement." *Id.* at 150.

In its decision, however, the Third Circuit specifically declined to delineate the precise perimeters of judicial review of arbitration awards:

> Both parties have urged us to reach the question of how narrow the limits of the scope of review of a collective-bargaining arbitration decision [on public policy grounds] are.... We do not ... need to reach this question of where lies the precise boundary around our reviewing authority because, under *Misco*, the district court has clearly exceeded it.

*Id.* In *National Ass'n of Letter Carriers, AFL–CIO,* the Third Circuit did not foreclose the possibility that "well defined" public policy concerns may justify vacating an arbitration award. The Third Circuit specifically refrained from determining whether the public policy exception should be broadly or narrowly construed holding only that in that case, *Misco* was clearly exceeded. *Id.*[8]

Some courts have declined to vacate arbitration awards based on public policy grounds. *See Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173, etc.,* 886 F.2d 1200, 1212–17 (9th Cir.1989), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990) ("*Stead Motors II*") (award reinstating auto mechanic who improperly tightened lug bolts upheld because no violation of a well defined and dominant policy shown); *Board of County Comm'rs v. Kimball and Assoc.,* 860 F.2d 683, 688 (6th Cir.1988), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 617 (1990) (award determining contracts for an indefinite term did not violate federal laws and regulations upheld because no violation of a well defined and dominant policy shown); *Daniel Constr.*

*Co., Div. of Daniel Int'l Corp. v. Local 257, Int'l Bhd. of Elec. Workers,* 856 F.2d 1174, 1181–82 (8th Cir.), *cert. denied,* 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 200 (1988) (award determining company's plans complied with regulations upheld because it drew its essence from contract); *Florida Power Corp. v. International Bhd. of Elec. Workers, etc. Local Union 433,* 847 F.2d 680, 681–83 (11th Cir.1988) (upholding award of reinstatement because arbitrator made finding that discharge was not for just cause); *National Ass'n of Letter Carriers,* 839 F.2d at 148–50 (award of reinstatement of postal employee who committed violence upheld because arbitrator found future violent acts remote and therefore would not violate public policy); *Oil Chemical and Atomic Workers, etc., Local No. 4–228 v. Union Oil Co.,* 818 F.2d 437, 441–43 (5th Cir.1987) (holding that arbitrator's reinstatement of employee who no longer used drugs and would not be a safety risk was not contrary to public policy); *Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 808 F.2d 76, 78 (D.C.Cir. 1987) (court refused to allow invocation of public policy exception and enforced arbitrator's reinstatement of pilot who had consumed alcohol while flying); *E.I. Du Pont de Nemours & Co. v. Grasselli Employees Indep. Assoc.,* 790 F.2d 611, 617 (7th Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986) (award of reinstatement not vacated where arbitrator made factual finding that employee to be reinstated had a remote chance of committing violent act); *Bevles Co. v. Teamsters Local 986,* 791 F.2d 1391, 1391–92 (9th Cir.1986), *cert. denied,* 484 U.S. 985, 108 S.Ct. 500, 98 L.Ed.2d 499 (1987) (court held that arbitrator's decision granting reinstatement and back pay to two undocumented aliens did not violate clearly defined public policy and was therefore not reviewable).

---

**8.** Other Third Circuit decisions following *Misco* have not definitively delineated the boundaries around a court's reviewing authority over arbitration awards. Recent Third Circuit decisions have largely concerned whether the arbitrator exceeded the scope of his or her arbitration authority by issuing an award which did not draw its "essence" from the collective bargaining agreement. *See Eichleay Corp.,* 944 F.2d at

1051; *GK Management, Inc. v. Local 274, Hotel Employees & Restaurant Employees Union,* 930 F.2d 301, 304–05 (3d Cir.1991); *News America Publications I,* 918 F.2d at 24–25; *Tanoma Mining Co.,* 896 F.2d at 748–50. The public policy exception was also not before the Third Circuit in *Bokunewicz v. Purolator Products, Inc.,* 907 F.2d 1396, 1399–1401 (3d Cir.1990) (courts determine issue of arbitrability, not arbitrators).

Other Courts of Appeals have overturned an arbitrator's award of reinstatement on public policy grounds, usually where the safety of the general public was implicated. *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 861 F.2d 665, 666–68 (11th Cir.1988), *cert. denied,* 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989) (award which reinstated pilot who flew while intoxicated was struck down); *Iowa Elec. Light & Power Co. v. Local Union, 204 of Int'l Bhd. of Elec. Workers,* 834 F.2d 1424, 1427–30 (8th Cir.1987) (vacating, for public policy reasons, arbitrator's reinstatement of nuclear power plant employee discharged for violating safety regulations); *Georgia Power Co. v. Int'l Bhd. of Elec. Workers, Local 84,* 707 F.Supp. 531, 533–34 (N.D.Ga.1989), *aff'd,* 896 F.2d 507 (11th Cir.1990) (vacating reinstatement of power company employee responsible for checking various meters and gauges to ensure that high pressure equipment did not overheat because employee was a chronic drug user); *United States Postal Serv. v. American Postal Workers Union,* 736 F.2d 822, 826 (1st Cir.1984) (arbitration award requiring reinstatement of employee who was convicted for embezzling postal funds was unenforceable as against public policy); *Amalgamated Meat Cutters & Butcher Workmen, Local Union 540 v. Great W. Food Co.,* 712 F.2d 122, 125 (5th Cir.1983) (reversing arbitrator's reinstatement of over-the-road truck driver who drank liquor while on duty); *Amalgamated Meat Cutters & Butcher Workmen v. Jones Dairy Farm,* 680 F.2d 1142, 1144–45 (7th Cir. 1982) (work rule which forbade employees from reporting unsanitary conditions directly to government officials violated public policy); *World Airways, Inc. v. International Bhd. of Teamsters, etc.,* 578 F.2d 800, 803–04 (9th Cir.1978) (vacating arbitrator's reinstatement of airline pilot who had been demoted for judgmental errors).

No clear standard has emerged regarding the authority courts have to vacate arbitration awards based on public policy grounds. Interwoven throughout the various decisions of the Courts of Appeals that have upheld arbitration awards despite public policy attacks is the emphasis on deference. Courts are to defer to the findings of fact by an arbitrator. *Misco,* 484 U.S. at 37–38, 108 S.Ct. at 370–71. Interpretations of a contract by an arbitrator are also deferred to unless the award does not draw its essence from the contract. *Id.* at 38, 108 S.Ct. at 371.

Juxtaposed against this fabric of deference, however, is the responsibility courts have been entrusted with to vacate arbitration awards which conflict with well defined and dominant public policies. *See W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183. Courts faced with deciding whether to vacate arbitration awards on public policy grounds often default to the deferential mode and consequently, they "choke[ ] the 'public policy' exception—*hic sepultus*—into oblivion." *Stead Motors II,* 886 F.2d at 1221 (Trott, J., dissenting).[9]

Findings of fact and public policy are oftentimes interwoven such that it is difficult to determine where the factfinding ends and the public policy begins. In this case, for example, the Arbitration Board's finding that Foster should be reinstated impacts on the public policies regarding who should be permitted to have significant operational responsibility for a 635-foot oil tanker loaded with petroleum products. When the negligent operation of an oil tanker can have disastrous effects on worker safety and the environment, it strains reason to assert that no public policies are involved.

Although the precise determination as to when courts should inquire about public

---

**9.** The dissent in *Stead Motors II* recognized this problem:

> I fail to see how we can square the plurality's rule of construction [finding public policy not violated] with *Misco*'s teaching that " 'the question of public policy is ultimately one for resolution by the courts.' " I believe that the plurality's construction relegates, under cer-

tain circumstances, the question of public policy to the arbitrator. If the asserted policy is one potentially threatened by the worker's future conduct, the plurality's rule would confer upon the arbitrator the unreviewable power to determine in effect whether the reinstatement violates public policy.

886 F.2d at 1227 (Trott, J., dissenting).

policy violations is uncertain, it is at least clear that once the public policy issues are isolated, the public policy considerations belong to the courts, not the arbitrator. As one court observed:

> An arbitration award is not to be based on public policy considerations, since public policy questions are for the court, not the arbitrator. An arbitrator who based an award on public policy considerations exceeds his powers. Accordingly when an arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, taking the facts as found by the arbitrator.

*Kimball and Assoc.*, 860 F.2d at 686; *see also W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183 ("Because collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by the governing agreements, 'the question of public policy is ultimately one for resolution by the courts.'").

Where factfindings and public policy overlap, determining the precise role of a court is a complicated task. Judicial opinions have accordingly vacillated on the proper approach. The Ninth Circuit, for example, recently determined that public policy would be violated by reinstating a mechanic who was improperly placing lug bolts on vehicles. *See Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173, etc.*, 843 F.2d 357 (9th Cir.1988) ("*Stead Motors I*"), *rev'd on hearing, Stead Motors II*, 886 F.2d 1200, *cert. denied*, 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). Upon rehearing *en banc*, the Ninth Circuit reversed itself. *See Stead Motors II*, 886 F.2d at 1212–17. The approach of the Third Circuit was to decline the invitation to ferret out the precise boundaries of the public policy exception. *National Ass'n of Letter Carriers, AFL–CIO*, 839 F.2d at 150; *see also E.I. Du Pont de Nemours*, 790 F.2d at 617 (also declining to "decide ... the precise legal standard for reviewing a factual finding that pertains to a public policy exception").

■ In this case, it is clear that where the public policy considerations concern public safety, courts should decide these issues instead of deferring them to arbitrators by cloaking them as arbitration issues. Where public safety is the public policy at issue, courts should err on the side of scrutinizing arbitration findings more closely and vacating arbitration awards which violate well defined and dominant public policies.

■ Arbitration awards which make factfindings affecting public safety are to be accorded less deference.[10] The several courts which have vacated arbitration awards on public policy grounds have relied on public safety concerns as their justifications. *See, e.g., Delta Air Lines*, 861 F.2d at 666–68; *Iowa Electric Light & Power Co.*, 834 F.2d at 1427–30.

■ In this case, the dangers associated with the negligent operation of a 635–foot oil tanker implicates significant public safety concerns. As required by *Misco* and *W.R. Grace*, the existence of a well defined and dominant public policy against having drug users operate commercial vessels is discussed below. Also addressed is how

---

**10.** In considering this issue, the Seventh Circuit observed:

> The appropriate standard of review for a factual finding such as this which pertains to a public policy exception has not yet been judicially established. On the one hand, plaintiff's attack on this factual finding can be viewed as an end-run around the normal extreme judicial deference to arbitral factfinding. Under this view, a court would apply that same extremely deferential standard of review to this type of factual finding as with all arbitral factual findings. On the other hand, this kind of factual finding is different

because it pertains to a public policy exception. An arbitral award is not to be enforced if it violates public policy, and this duty would be impaired if a court had to defer to clearly erroneous factual findings made by the arbitrator. *Viewed in this light, a less deferential standard of review such as the "clearly erroneous" standard embodied in Fed. R.Civ.P. 52(a) might be more appropriate with respect to this type of [public policy] factual finding.*

*E.I. Du Pont de Nemours*, 790 F.2d at 617 (emphasis added).

this policy would be clearly violated by not vacating the Arbitration Award reinstating Foster.

The prevalence of drug testing programs to combat drug use in the workplace demonstrates the public policy against having drug-impaired employees in the workplace. The Drug–Free Workplace Act, 41 U.S.C. § 701 *et seq.,* imposes drug-free workplace requirements for federal contractors. Under the Drug–Free Workplace Act, to which Exxon is bound, "[n]o person ... shall be considered for the procurement of any property or services of a value of $2,000 or more from any federal agency unless such person has certified to the contracting agency that it will provide a drug-free workplace...." 41 U.S.C. § 701(a)(1). Among its requirements, the Drug–Free Workplace dictates that employers inform their employees of the "dangers of drug abuse in the workplace." 41 U.S.C. § 701(a)(1)(B)(i).

Specific to the facts of this case are the Coast Guard regulations regarding drug testing. These regulations were established to "minimize the use of intoxicants by merchant marine personnel and to promote a drug free and safe work environment." Chemical Testing, 46 C.F.R. § 16.101 (1990) (Coast Guard, Department of Transportation). The policies against drug use by marine personnel are highlighted by the Coast Guard regulations which state that (1) a marine employer may not allow someone who has tested positive for any illegal drug to perform duties affecting the safety of the vessel's navigation, (2) the Coast Guard will revoke the license of anyone who tests positive for illegal drugs and (3) anyone who fails a test for dangerous drugs is presumed to be a user of dangerous drugs. *Id.*

Additionally, a myriad of regulations from various Governmental agencies concerning drug testing programs highlights the efforts made to eradicate drug and alcohol abuse in the workplace. *See* Guidelines for Nuclear Power Plant Drug and Alcohol Testing Programs, 10 C.F.R. § 26 (1991); Federal Aviation Administration Drug Testing Program, 14 C.F.R. § 121, Appendix I (1991); Procedures for Transportation Workplace Drug Testing Programs, 49 C.F.R. § 40.1 (1991) (Dep't of Transp.); Department of Defense Drug Abuse Testing Program, 32 C.F.R. § 60.1 (1991); Control of Alcohol and Drug Use: Procedures and Safeguards for Urine Drug Testing, 49 C.F.R. § 219, Appendix A (1990) (Federal Railroad Administration); Control of Drug Use in Mass Transportation Operations, 49 C.F.R. § 653.1 (1990) (Urban Mass Transportation Administration).

The First Circuit specifically found a "well-defined public policy against the use of drugs in the workplace." *S.D. Warren Co., Div. of Scott Paper Co. v. United Paperworkers Int'l Union, Local 1069,* 815 F.2d 178, 186 (1st Cir.1987) ("*Warren I*"), *vacated,* 484 U.S. 983, 108 S.Ct. 497, 98 L.Ed.2d 496 (1987), *on remand,* 845 F.2d 3 (1st Cir.1988) ("*Warren II*"). The First Circuit observed:

> There are laws against the sale and use of drugs enacted by all states, ... and the sale and use of drugs is a serious offense under federal laws. Furthermore, the nation has focused on the corrosive consequences of drug sale and use and has devoted itself to their eradication. In particular, the work shop is a place where such usage is abominable not only because of the health hazard it creates, but also because it creates an unsafe atmosphere and is deteriorative of production, the quality of the products, and competition.

815 F.2d at 186.[11]

Recent Supreme Court decisions regarding drug testing have also recognized the public policy concerns against having drug-impaired employees at the helm of safety-

---

**11.** On remand, the First Circuit in *Warren II* did not specifically reaffirm the *Warren I* ruling vacating the arbitration award based on public policy. *Warren II,* 845 F.2d at 7. The First Circuit in *Warren II* observed that: "We shall assume without deciding that *Misco* forecloses the alternate public policy grounds upon which we decided *Warren I." Id.* The First Circuit in *Warren II* observed that the *Iowa Elec. Light & Power* decision relied on *Warren I* "as a basis for refusing to enforce [an] arbitration award on public policy grounds." *Id.*

sensitive positions by upholding the legality of drug testing programs.. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 670–71, 109 S.Ct. 1384, 1393, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 620, 627, 109 S.Ct. 1402, 1418, 103 L.Ed.2d 639 (1989). As the *Skinner* Court observed, the Government has a strong interest in preventing employees "from using alcohol or drugs while on duty, or while subject to being called for duty" in order to ensure the safety of the public and of the employees themselves. 489 U.S. at 621, 109 S.Ct. at 1415.

Statutes, cases and regulations concerning drug testing and the dangers of drug use in the workplace comprise a well defined and dominant public policy which supports the policy against having drug users operate commercial vessels. As outlined below, this policy would be clearly violated if the Arbitration Award granting reinstatement were upheld.

The Arbitration Award does not require any rehabilitation efforts. Significantly, however, Foster never requested rehabilitative treatment for his drug use. To prevent a recurrence of another drug-related incident, the Arbitration Board merely required that Foster be subject to random drug testing for a year:

> [F]or a period not to exceed one year from his report to work, Foster may be randomly tested, by urine analysis, by the Company. In this way, the Company and the Union can insure that Foster is not violating the [Drug] Policy. Foster must understand that he must conduct himself in his private life (as well as the rules regarding the workplace) so that he will not be in violation of the [Drug] Policy. A repeat positive will undoubtedly lead to his discharge. So will a refusal to be tested.

Titus Aff., Ex. A at 21. In addition, at the hearing on the motion to vacate, the Union's counsel stressed Exxon's policy to rehabilitate employees rather than discharging them to argue that public policy did not require discharging Foster.

Exxon's rehabilitation policies, however, stress preventive rehabilitation efforts rather post-violation/post-accident attempts to seek treatment. The Drug Policy states:

> No employee with alcohol or drug dependency will be terminated or otherwise disciplined solely due to a request for help in overcoming that dependency or because of involvement in a rehabilitation effort. If, however, an employee violates provisions of the Employee Alcohol and Drug Use Policy, appropriate disciplinary action will be taken. *Such action cannot be avoided by a request at that time for treatment or rehabilitation.*

Titus Aff., ex. D (emphasis added). The 27 September 1988 Letter reiterated this policy:

> [I]f an employee's request for rehabilitation is made after the Company's discovery of a violation of the [Drug] [P]olicy, the Company will take disciplinary action which may include termination. Such disciplinary action cannot be avoided by a request for treatment or rehabilitation at that time.

Titus Aff., ex. G.

Rehabilitation plays a key role in determining whether public policies would be violated by reinstating an employee who tested positive for drugs. Rehabilitative efforts, however, work best when used as a preventive tool. Thus, Exxon's Drug Policy stressed preventive treatment and explicitly stated requests for rehabilitation may not be made post violation or post accident simply to avoid disciplinary action for a violation of the Drug Policy. Although reinstating rehabilitated employees may not itself offend public policy, *see Delta Air Lines*, 861 F.2d at 674, reinstating an employee who tested positive for drugs and who did not request rehabilitation does.

The public policy underlying efforts to keep drug users from operating commercial vessels is severely undermined by the Arbitration Award. Requiring Exxon to reinstate Foster also subverts the Drug Policy. Reinstating Foster frustrates Exxon's efforts to eradicate drug use in the

workplace and prevents Exxon from carrying out its obligation and duty to eliminate drug use from among its employees and especially among those employees responsible for the operation or navigation of its ships.

Requiring reinstatement in effect condones Foster's illegal activity. *See Newsday, Inc. v. Long Island Typographical Union, No. 915, CWA,* 915 F.2d 840, 843 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1314, 113 L.Ed.2d 247 (1991).[12] The indifference with which the Arbitration Award treats Foster's drug use sends an undesirable signal to other employees that drug use in a safety-sensitive job and industry would not be severely punished. The lack of deterrence nurtures an environment unsafe for the workers, the public and the environment.

Foster was tested partly because the Coast Guard regulations require testing of persons involved in a "serious marine incident" or "marine casualty." *See* Pl.'s Br. at 7. Because the Arbitration Board considered the grounding of the Exxon Wilmington to be a serious marine accident, it held the testing of Foster was justified.

The Arbitration Board found reasonable cause existed to test Foster and that the testing was proper because of the "potential risk to other employees, the environment, and the public." *Id.* (citation omit-

ted). Testing positive for marijuana was sufficient for the Arbitration Board to determine that Foster engaged in misconduct, violated the Drug Policy and therefore was subject to discipline.[13]

Cases which have upheld arbitration awards despite public policy attacks concerned findings of fact made by the arbitrator which persuaded courts that public policies would not be violated. In *National Ass'n of Letter Carriers, AFL–CIO,* the arbitrator made a specific finding of fact that a postal employee who fired gun shots at his Postmaster's empty parked car no longer showed violent tendencies. 839 F.2d at 149. Because the arbitrator found the employee no longer posed a safety threat, the Third Circuit held no public policies concerning the safety of the employee's co-workers would be violated. *Id.*

In *Oil Chemical and Atomic Workers, etc. Local No. 4–228,* the arbitrator found that an employee who was discharged for using drugs no longer posed a safety threat because the employee had stopped using drugs. The court observed:

> This court has recognized the strong public policy against the operation of dangerous equipment by persons using drugs or alcohol. However, the arbitrator found the probability that [the employee's] off-premises drug use would hinder or be involved in her performance

---

**12.** In *Newsday,* the Second Circuit decided to affirm the vacation of an arbitration award which reinstated without back pay an employee charged with sexual harassment. 915 F.2d at 843. Although the arbitrator found the dismissed employee had committed several acts of sexual harassment, he concluded that immediate discharge, as opposed to discipline, would be contrary to the concept characterized as progressive discipline. *Id.* As with this case, the arbitrator determined that the employee understood his conduct was unacceptable and that future violations would be grounds for immediate discharge. *Id.*

The district court vacated the arbitration award on the grounds of public policy, finding that statutes, regulations and judicial decisions clearly condemned sexual harassment in the workplace. *Id.* In affirming the decision to vacate, the Second Circuit found that the arbitration award should be vacated because it *"condoned [the employee's conduct], it tends to perpetuate a hostile, intimidating and offensive work environment.... Above all, the award*

*prevents [plaintiff] from carrying out its legal duty to eliminate sexual harassment in the workplace." Id.* at 845 (emphasis added).

The same rationale applies to the effect of the Arbitration Award in this case. Reinstating Foster condones his misconduct and sends a signal of tolerance toward drug use among Exxon's employees. Finally, the Arbitration Award prevents Exxon from carrying out its legal duty to eliminate drug use from its workplace. Although sexual harassment is an odious offense, the risk of physical dangers and potential environmental catastrophes which follow any tolerance for drug use among the crew on oil tankers would appear to provide an even more pressing need to (and public policy reasons for) vacate the arbitration award in this case.

**13.** The Arbitration Board concluded that Exxon's 20 ng/ml screening level was reasonable even though it was lower than the Coast Guard's regulations. Pl.'s Br. at 7.

on the job in the future was too low to merit her discharge. Off-duty/off-premises conduct involving the illegal use and sales of drugs is not *per se* justification for a worker's discharge. The collective bargaining agreement provides for binding arbitration. *It was within the discretion of the arbitrator in [the employee's] case to credit the public policy favoring drug rehabilitation and find that [the employee] no longer used drugs and would not present a safety risk in the future. Based on the facts available at the time of the arbitration decision, enforcement of the arbitrator's award would not have violated public policy.*
818 F.2d at 442 (emphasis added).

In *Northwest Airlines, Inc.,* the award was not found to violate public policy because the award required the employer to reinstate the pilot only after he was recertified by the FAA as fully fit and licensed to fly. 808 F.2d at 83. In that case, the public safety concerns were satisfied through the recertification requirement.

In this case, there are no findings that Foster would no longer use drugs or that the possibility of future drug use by Foster would be remote. Neither were there any conditions placed on his reinstatement. Foster was only cautioned that if he was found using drugs once more, he would be subject to immediate discharge. On these facts, public policy is violated by reinstating Foster.

The Union stresses the fact that no "subjective or objective evidence of impairment" of Foster was found or that Foster was unfit for duty. Def.'s Br. at 4. The fact that Foster was not found consuming or possessing marijuana while at work, however, does not detract from the fact that he tested positive for the drug while discharging his duties as helmsman in violation of the Drug Policy. Moreover, even if the 27 September 1988 may not have been a part of the Agreement, Foster was clearly on notice that Exxon intended to terminate any employee for any violation of the Drug Policy. The 29 March 1988 Letter stated: "Being unfit for work be-

cause of drugs or alcohol is strictly prohibited and is grounds for termination of employment." Complaint, ex. B. Indeed, Foster had notice of the Drug Policy, the 29 March 1988 Letter and the 27 September 1988 Letter for months before he left for sea and the Exxon Wilmington ran aground on 7 April 1989.

The grounding of the Exxon Valdez a few weeks before the grounding of the Exxon Wilmington underscores the safety and environmental tragedies which can result from the grounding of a large vessel carrying vast amounts of oil or petroleum products. Exxon, confronted with extensive destruction of the environment and the bill for billions of dollars in clean-up costs from the Exxon Valdez incident, wished to avoid other such incidents. The decision of the Arbitration Board to reinstate Foster unjustly favors the re-employment of one individual not only at the expense of Exxon's coffers and its ability to protect itself from liability, but at the expense of the public's safety and environmental interests.

The mere appearance of a problem at times is as troubling as the problem itself. An employee does not have to be unable to speak or walk or think to be impaired or unfit for work. The use of illicit drugs or the presence of illicit drugs in the system of Foster while he was at the helm of the Exxon Wilmington at the time of the accident creates, *at the very least,* the appearance of a problem. In reality, it creates a serious problem in fact. Foster had significant operational responsibility for an ocean-going oil tanker. The decision by Exxon to terminate his employment was both correct and just.

Oil companies in general, and Exxon in particular, have been the subject of harsh criticism concerning their efforts to protect the safety of the public and to preserve the environment. In many instances, oil companies are not regarded as good corporate neighbors. For Exxon to continue in its employ as a helmsman, a person such as Foster creates the appearance of a disregard for the safety of the public and the environment. If Foster is involved in another accident with similar amounts of a

controlled substance in his system, Exxon would be hard put to explain or justify his employment.

In this case, it is uncontroverted that Foster tested positive for marijuana. The risk in which Foster placed the public and the environment is inexcusable. Were Foster merely derelict in a non-sensitive office position, public policies would not mandate, as stringently, the vacating of the Arbitration Award. Foster, however, was implicated as part of the crew which grounded the Exxon Wilmington—a 635-foot tanker carrying specialty oils. This accident could have led to another environmental disaster similar to the one created by the grounding of the Exxon Valdez.

Foster was not a desk-bound employee; as mentioned, he had significant responsibilities for the operation of a large, ocean-going oil tanker. Public policy considerations must place public safety and welfare above considerations of individuals such as Foster in this instance. Those who chose to make their living with heavy responsibility for the operation or navigation of ships, aircraft or rail traffic (regardless of whether the conveyance may be passenger or freight) or in industries such as nuclear power plants, must anticipate much will be demanded of them with regard to on-the-job performance. There is no margin for error in these industries. A mistake is usually catastrophic in terms of loss of life, damage to the environment or destruction of property. A mistake caused by or clouded by the presence of drugs in the system of a worker is simply unacceptable.

It flies against notions of common sense to reinstate an employee, who tested positive for drugs, to a position where he potentially increases the risks of another oil spill. Public policy would be violated by enforcing the Arbitration Award. Accordingly, the Arbitration Award is vacated.

C. Attorney's Fees and Costs

Exxon requests attorney's fees and costs for the litigation over the arbitration award. Awarding attorney's fees and costs in this case, however, is not proper. "[W]here an employer challenges an arbi-

tration award ... a party is expected to bear the burden of its own legal expenses unless 'the losing party litigated in bad faith, vexatiously, or for oppressive reasons.'" *Aydin Vector Div. v. International Union of Electronic, Elec., Salaried, Machine and Furniture Workers, AFL–CIO, Local 318,* No. 91–1433, 1991 WL 259133, *2, 1991 U.S.Dist. LEXIS 17,-481, *6 (E.D.Pa. 3 Dec.1991) (quoting *Mobil Oil Corp. v. Independent Oil Workers Union,* 679 F.2d 299, 305 (3d Cir.1982)). Because Exxon has not shown that the Union failed to litigate this case in good faith, Exxon's request for attorney's fees is denied.

*Conclusion*

The Arbitration Award is vacated. Exxon's request for attorney's fees is denied.