**BOARD OF COUNTY COMMISSION-
ERS OF LAWRENCE COUNTY,
OHIO, Plaintiff–Appellee,**

v.

**L. ROBERT KIMBALL AND ASSOCI-
ATES, Defendant–Appellant.**

**No. 87–3635.**

United States Court of Appeals,
Sixth Circuit.

Argued March 29, 1988.

Decided Nov. 3, 1988.

John E. Jevicky, Dinsmore & Shohl, Cincinnati, Ohio, James P. Hollihan, argued, Manion, McDonough & Lucas, Pittsburgh, Pa., for defendant-appellant.

Robert J. Hollingsworth, argued, Stephen S. Holmes, Cors, Bassett, Kohlhepp, Hallora & Moran, Cincinnati, Ohio, Craig A. Allen, Ironton, Ohio, for plaintiff-appellee.

Before WELLFORD and NORRIS, Circuit Judges, and COOK, District Judge.*

ALAN E. NORRIS, Circuit Judge.

L. Robert Kimball and Associates ("Kimball") appeals the district court's having granted summary judgment to the Board of County Commissioners of Lawrence County, Ohio. The court reasoned that contracts relied upon by Kimball in its claim against the county are unenforceable as a matter of public policy.

During 1971, Kimball, an engineering firm, entered into two contracts with Lawrence County to provide it with preliminary engineering services for a proposed county-wide sewage treatment system and for improvements to an existing treatment plant. These preliminary services included Kimball's acting as the county's representative in the development phases of the project and producing a preliminary engineering report to be used in obtaining government funding. Under the contracts, if the project proceeded beyond the preliminary stage, the county was to compensate Kimball for the preliminary services and to hire the company to perform the subsequent engineering work. The contracts also provided for arbitration "of all questions in dispute under this Agreement ... in accordance with the rules of the American Arbitration Association."

From 1971 until 1973, Kimball acted as the county's representative in dealing with health and water authorities and pollution control agencies, and prepared preliminary reports on the proposed system and on improvements to the existing system. According to Kimball, the firm became less involved in the project in 1973 due to the increasing involvement of the Army Corps of Engineers, and the passage of amendments to the Federal Water Pollution Control Act. After 1973, and until 1984, there was no contact between the county and Kimball on the projects. However, during this period there were changes in federal laws concerning funding and plan requirements; the Corps of Engineers researched and completed a facilities plan which was accepted by the county; and in 1978, the county hired another engineering firm to do the engineering work as contemplated by the Corps plan. The plan was revised several times, both by the Corps and the new engineering firm. It received tentative approval by the Environmental Protection Agency in early February 1984.

In April 1984, when Kimball learned that the sewage project was being funded and was going forward with new project engineers, it demanded compensation for the work it completed in 1971 and 1972, and insisted that it be retained to perform final design work. When the county refused, Kimball demanded arbitration. Although an arbitration hearing was scheduled, the county filed a complaint in the state court of common pleas, asserting a state law claim for damages and seeking an injunction against the arbitration proceedings. On Kimball's motion, the state court proceedings were removed to district court, where Kimball filed a counterclaim requesting a stay of the proceedings pending arbitration under the provisions of the United States Arbitration Act.

In May 1985, the district court issued an order granting Kimball's motion for a preliminary injunction and requiring the coun-

---

* The Honorable Julian A. Cook, Jr., Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

ty to arbitrate. Basing its decision on *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the district court concluded that the county's claim that the contracts were ultra vires because they were for an indefinite term was a legal defense to the enforceability of the contract which properly should be referred to arbitration.

The claims were arbitrated before a three-member panel appointed under the rules of the American Arbitration Association, and the panel entered an award for Kimball.

The county then sought to vacate the arbitration award, and moved for summary judgment. Kimball counterclaimed seeking confirmation of the award, and also moved for summary judgment. The district court granted the county's motion for summary judgment and vacated the arbitration award, saying it had reevaluated its previous order to arbitrate and concluded that, under *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), it had the power to determine that the contract dispute was not subject to arbitration. The court then addressed the merits of the parties' claims and declared the contracts invalid as a matter of public policy, since they contained no definite term and could extend beyond the "life" of the board of county commissioners which agreed to the contract. The court also concluded that the contracts were contrary to public policy because they conflicted with federal law enacted after the contracts were entered into. The court did not address the county's state law claims. Its order was certified pursuant to Fed.R.Civ.P. 54(b), and this appeal followed.

We conclude that the district court's initial decision, that the contract dispute and the county's defense that the contract was ultra vires should be arbitrated, was correct, and that public policy does not require that the arbitration award be overturned.

In *Prima Paint*, the plaintiff's claim that the contract, which contained an agreement to arbitrate, was fraudulently induced was held to have been properly referred to arbitration for resolution. The Supreme Court determined that, under the provisions of the United States Arbitration Act, a federal court is to order arbitration if the making and performance of the agreement to arbitrate itself is not in dispute. 388 U.S. at 403–04, 87 S.Ct. at 1805–06. The plaintiff in *Prima Paint* did not claim that the agreement to arbitrate was fraudulently induced, and there was no indication that the broad language of the arbitration agreement was not intended to cover legal issues such as fraudulent inducement of a contract.

■ Similarly, the question before the district court was not whether the dispute was subject to arbitration. Instead, the question involved the validity of contracts which happened to include provisions for arbitration. Under *Prima Paint*, resolution of that question was for the arbitrators. The county's claim that the contracts were ultra vires is a legal defense to the enforceability of the contracts. Rather than contending that it had not agreed to the broad arbitration clause in the contracts, the county instead questioned the enforceability of the entire contract. Had it contended that its dispute with Kimball over reimbursement and hiring was not subject to arbitration, we would be faced with a different question, since "[i]t [is] for the court, not the arbitrator, to decide in the first instance whether the dispute [is] to be resolved through arbitration." *AT & T Technologies, Inc.*, 475 U.S. at 651, 106 S.Ct. at 1420.

■ Once it is determined that a dispute should be referred to arbitration, questions of contract interpretation are within the province of the arbitrator. Courts play only a limited role in reviewing an arbitration decision. "The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *United Paperworkers Int'l Union v. Misco*, —— U.S. ——, ——, 108 S.Ct. 364, 370, 98 L.Ed. 2d 286 (1987).

The county's claims that the contracts were ultra vires and were inconsistent with

federal statutes and regulations were presented and argued to the arbitrators. Although they issued no written opinion, one must of necessity assume that the arbitrators, in order to rule for Kimball, determined that the contracts were valid, enforceable contracts between the parties—that they were neither ultra vires nor inconsistent with federal statutes and regulations—and that Lawrence County had breached the contracts.

The district court also held that, because the contracts were for an indefinite term, they violated Ohio's public policy against such contracts, and that the contracts also violated public policy because they were inconsistent with subsequently enacted federal law and regulations.

■ Whether an arbitration award violates public policy is a question for the court. *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). However, a court's refusal to enforce "an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate 'some explicit public policy' that is 'well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." ' " *Misco,* 108 S.Ct. at 373 (quoting *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183). A court may refuse to enforce an award when specific terms in the contract would violate public policy, but there is no broad power to set aside an arbitration award as against public policy. *Id.*

The county argues that a different standard of review applies to a court's review of an arbitration award challenged on public policy grounds, than to the court's review of an arbitration award under the Arbitration Act. It cites *Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers,* 834 F.2d 1424 (8th Cir.1987), for the proposition that the court should engage in a *de novo* review of an arbitration award whenever a question of public policy is raised.

*Iowa Electric* dealt with the question of whether an arbitration award, which reinstated an employee who had violated nuclear safety regulations and whose actions could have jeopardized the public health and safety, was against national public policy concerning strict compliance with safety regulations at nuclear facilities. *Id.,* 834 F.2d at 1426. Here, the contract itself is asserted to be against public policy, and the arbitration award is challenged because it is said that it would enforce an ultra vires contract.

■ Moreover, properly speaking, the review given an arbitration award when it is challenged on public policy grounds is not *de novo.* When a court reviews an issue under a *de novo* standard of review, the court is determining questions of fact and law as though the reviewing court was the original trial court (or the arbitration panel). An arbitration award is not to be based on public policy considerations, since public policy questions are for the court, not the arbitrator. An arbitrator who bases an award on public policy considerations exceeds his powers. Accordingly, when an arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, taking the facts as found by the arbitrator.

■ In addressing the question of whether the contracts as interpreted by the arbitrators were contrary to public policy because they were for an indefinite term, the district court correctly looked to Ohio law to determine whether there was a well-defined and dominant public policy against such contracts. In concluding that Ohio has such a policy, the district court relied upon *State ex rel. Allen v. Lutz,* 111 Ohio St. 333, 145 N.E. 483 (1924), and *State ex rel. Hubbard v. Hilty,* 31 Ohio Law Abs. 538 (Ct.App.1940). We are unable to agree with the district court's reading of these cases.

The Ohio Supreme Court's opinion in *Lutz* includes this language:

In order to bind a subsequent board of county commissioners ..., the right and

power to do so must clearly appear, and not be left to inference alone from the nature of the contract and the kind of work affected thereby.

The policy of the law is rather against the power of one board of county commissioners to make contracts so indefinite in time that the same may extend beyond the life of the board, and thus bind another or future board, although in some cases such a contract may be valid and binding even though the performance of some part may be impossible until after the expiration of the term of the majority of the board as it existed when the contract was made. Yet the general rule is that such contracts, extending beyond the term of the existing board, and employment of agents or servants of the county for such period, thus tying the hands of a succeeding board, are not looked upon with favor unless the necessity or some special circumstances show that the public good requires such contracts to be made.

111 Ohio St. at 338–39, 145 N.E. at 484–85.

In *Lutz*, a sanitary engineer contracted with the county to provide planning and supervisory services in exchange for compensation to be based upon a percentage of the cost of the public works with which he was involved. After the contract was entered into, the state legislature enacted a statute which limited the compensation paid to a sanitary engineer to no more than that received by the county auditor. The engineer filed a mandamus action to require the county to pay compensation he had earned under the contract in excess of the county auditor's salary. The Ohio Supreme Court, after noting that a statute specifically authorized county commissioners to contract with a sanitary engineer "for such time . . . as they deem best," so long as the length of the term was specified, held that, since the contract before it was for an indefinite term, it did not come within the protection of the state's constitutional guarantee against impairment of contract, and its compensation provision would not be enforceable beyond the statutory limitation. *Id.* at 338–39, 145 N.E. 483.

Because the rule of law the district court drew from the opinion's quoted language does not appear in the Ohio Supreme Court's official syllabus to its opinion, under the unique Ohio rule, the quoted language does not state the point of law decided in that case. Ohio Supreme Court Rules for the Reporting of Opinions, Rule 1(B) (eff. Mar. 1, 1983). But, even putting the syllabus rule aside, the Ohio Supreme Court did not say that county commissioners are without the power to enter into any contracts extending beyond the current terms of incumbent commissioners, nor did it say that all such contracts are contrary to public policy. What the court pointed out in the quoted language was that some contracts of this nature may be ultra vires, and that, as a matter of public policy, they are not looked upon with favor in the absence of "necessity or some special circumstances."

The Ohio Supreme Court did not leave us with any specific guidance as to what Ohio courts should view as "necessity or some special circumstances." However, we may at least be certain that the Ohio Supreme Court viewed some contracts for engineering services which extend beyond the elected terms of county commissioners as involving "necessity or some special circumstances," since it allowed the one before it to stand, to the extent that compensation was limited by statute. Because we are unable to discern any telling differences in that regard between the contract for engineering services in *Lutz*, and the one entered into by Lawrence County's Board of Commissioners, we may confidently conclude that Ohio courts would deem the latter to involve "necessity or some special circumstances."

Nor do we think the opinion of the Ohio Court of Appeals in *Hubbard v. Hilty* establishes a well-defined and dominant public policy. In that case, pursuant to an informal arrangement with a local women's club, county commissioners had employed a female attendant for a courthouse ladies' restroom, after the club had provided furnishings for the room. Some years later, citing economic reasons, the commissioners abolished the position. In an opinion hold-

ing that the attendant's civil service status was no protection where a position was abolished, the court of appeals included this dicta about the arrangement:

> [I]f it reached the dignity of an agreement, [it] had no binding force in law, as a Board of County Commissioners is inhibited by law from making any agreement which has the effect of restraining it or its successors in office from exercising any of the discretionary powers vested in it, or performing any of the duties imposed upon it by law. . . .

*Hilty,* 31 Ohio Law Abs. at 540. We are in no position to say that the court's gratuitous use of this broad language, without reconciling it with the Ohio Supreme Court's opinion in *Lutz,* can serve as the basis for concluding that Ohio has a well-defined and dominant public policy against contracts for an indefinite term.

In the absence of any statute prohibiting county commissioners from entering into contracts which may extend beyond the term of the contracting board, and in the absence of any clear legal precedent which establishes a well-defined and dominant public policy, we conclude that the arbitration award is not against public policy and must be enforced.

█ The district court also held that the contracts violated public policy because they were inconsistent with the federal law and regulations. As we pointed out earlier, the question of inconsistency was presented to and decided by the arbitrators. The arbitrators did not decide whether the contracts were against public policy, but rather, interpreted and applied the contracts to determine whether they were consistent with federal law and regulations, which was an integral part of resolving the dispute between the parties. Courts normally must enforce an arbitrator's resolution of these issues even if there is an erroneous finding of fact or misinterpretation of law, and an arbitrator's conclusions on legal issues are entitled to deference. *Northrop Corp. v. Triad Int'l Mktg. S.A.,* 811 F.2d

* This opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing in banc because of the arguable conflict with the decisions of the

1265, 1269 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 261, 98 L.Ed.2d 219 (1987). Deference is not due to the arbitrator's award if there is a "manifest disregard" of the law, *see, e.g., Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 2d 168 (1953), but that does not appear to be the case here. Because we conclude that the contracts could be interpreted in a manner consistent with federal statutes and regulations, the district court erred in holding that the arbitration award should be vacated as being contrary to public policy.

Accordingly, the judgment appealed from is reversed and this cause is remanded to the district court for enforcement of the arbitration award, and for other proceedings consistent with this opinion and according to law.