**MIDMICHIGAN REGIONAL MEDICAL CENTER–CLARE, Plaintiff–Appellee,**

v.

**PROFESSIONAL EMPLOYEES DIVISION OF LOCAL 79, SERVICE EMPLOYEE INTERNATIONAL UNION, AFL–CIO, Defendant–Appellant.**

No. 98–1464.

United States Court of Appeals, Sixth Circuit.

Argued: June 9, 1999.

Decided and Filed: July 12, 1999.

498

John R. Runyan (argued and briefed), Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, Detroit, Michigan, for Defendant–Appellant.

Valerie P. Simmons (argued and briefed), Warner, Norcross & Judd, Grand Rapids, Michigan, for Plaintiff–Appellee.

Before: DAUGHTREY and MOORE, Circuit Judges; STAFFORD,* District Judge.

## OPINION

MOORE, Circuit Judge.

The district court set aside an arbitrator's decision ordering the MidMichigan Regional Medical Center at Clare to reinstate Barbara Krantz to her position as a staff nurse. MidMichigan fired Krantz after she had difficulties operating a piece of equipment during an emergency situation. The arbitrator found that Krantz had not committed the error of which she was accused, that her actual error was less serious, and that a six-month suspension rather than dismissal was an appropriate sanction. The district court incorrectly held that this award exceeded the arbitrator's authority and was contrary to public policy. We therefore **REVERSE** the district court's decision and **REMAND** this case with instructions to reinstate the arbitrator's award.

## I. BACKGROUND

Krantz is a licensed registered nurse ("RN") who held a position as a staff nurse at MidMichigan, a small, acute-care hospital in Clare, Michigan. During her almost ten years of service, she worked in several different departments of the hospital. At the time of the incidents involved in this suit, she was assigned to the Intensive/Progressive Care Unit ("ICU/PCU"), which contains some of the hospital's most critically ill patients. Krantz was represented by the defendant union, and her employment was governed by a collective bargaining agreement ("CBA").

In March 1995, Krantz received a written reprimand for errors with a patient's medication. A doctor had ordered that the patient receive intravenous Dopamine, a drug used to increase cardiac output. On

two occasions, Krantz mistakenly added Dobutamine, another drug used for the same purpose, to a premixed Dopamine solution. On the first occasion, a supervisor caught the error after Krantz had begun to administer the solution to the patient. On the second occasion, Krantz and another RN caught the error before administering the medication.

Nine months later, Krantz was the only RN assigned to the ICU/PCU for the 7:00 p.m. to 7:00 a.m. shift that began on December 26, 1995. She had primary responsibility for a critically ill cardiac patient who early in the shift had a transvenous pacemaker inserted to assist his heart. Shortly after the pacemaker was inserted, the patient went into cardiac arrest, and a "Code 99" was called. Responding to the code were Krantz; Sanjeeb Goyal, the attending physician; Kenn McJames, a licensed practical nurse ("LPN"); Connie Juneac, another LPN; Kathryn Leaman, a respiratory therapy technician; and Sandy Sabuda, another hospital employee. Krantz took charge of the Zoll Monitor, a device located on the crash cart at the foot of the patient's bed.

A Zoll Monitor works through pads and wires attached to the patient's chest. It can perform three different functions: monitoring the patient's heartbeat, assisting the patient by pacing the heart, and defibrillating the patient in the event of cardiac arrest. The operator of the machine turns a dial to select one of the three functions. If the operator selects defibrillation, she must then set the current level and press the "charge" button. The machine takes six to ten seconds to charge. Then, two conspicuous orange "discharge" buttons must be pressed simultaneously. This action sends an electric current through the patient. Because the current is dangerous to anyone in contact with the patient at the time, the operator must call

* The Honorable William Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

"clear" before pressing the discharge buttons.

From their positions around the patient, McJames and Juneac saw Krantz attempting to operate the Zoll Monitor. They saw her hand moving up and down near the discharge buttons. Both were concerned that Krantz was trying to defibrillate the patient without calling "clear." Juneac told her not to do it. Krantz responded that she could not get the machine to charge, and Juneac reminded her that she first had to switch from pacer mode to defibrillation mode. Either Goyal or Krantz then did so, and Goyal defibrillated the patient, ending the code. The code had lasted approximately three minutes.

McJames and Juneac reported their observations of Krantz's performance to a supervisor, apparently stating that she had tried to defibrillate the patient without calling "clear." Krantz was suspended while the hospital investigated. On January 2, 1996, she was fired. Her disciplinary notice stated:

> Reasons for This Action: ... Gross neglect of duty on December 26, 1995, (exhibited a clear lack of good nursing judgement and lacked the proper knowledge of unit equipment which jeopardized the lives and safety of a patient and fellow employees) and on March 9, 1995.
>
> Explanation of Facts: ... On 12/26/95, you were observed by three (3) ICU nursing staff and one (1) physician, to be pressing the defibrillation discharge buttons during a cardiac arrest, while two (2) employees and one (1) physician were giving rescucitation [sic] efforts thus being in contact with the patient. Had the selector switch been placed on the defib mode rather than the pace mode, these individuals would have received an electrical shock resulting in severe injury or death.

Joint Appendix ("J.A.") at 279 (Disciplinary Action). The phrase "[g]ross neglect of duty on December 26, 1995," appears to be drawn from the hospital's work rules,

which state that an employee guilty of "[g]ross neglect of duty" is subject to immediate suspension, investigation, and discharge. J.A. at 313 (Rules). The union grieved Krantz's discharge and eventually took the matter to arbitration.

Krantz, Juneac, McJames, and Leaman testified at the arbitration hearing, as did Robert Briggs, the nurse manager who investigated the incident. The arbitrator found insufficient evidence that Krantz had tried to defibrillate without calling "clear." Rather, the evidence indicated that Krantz attempted to charge the Zoll Monitor without switching it from pacer mode to defibrillation mode. When McJames and Juneac saw her hand moving up and down repeatedly, they were seeing her attempts to charge the monitor. The arbitrator pointed out that because the machine is small, it was understandable that the witnesses might think Krantz was pressing "discharge" instead of "charge." He also noted that to discharge the current Krantz would have had to press two buttons simultaneously, which would normally be done with two hands. Thus, although Krantz negligently failed to switch from pacer mode to defibrillation mode, thereby delaying defibrillation, her mistake was not as serious as the hospital claimed. The arbitrator therefore concluded that Krantz's discharge was not justified under the CBA or the hospital's work rules. However, in light of Krantz's negligence during the code and her medication errors nine months before, the arbitrator felt that a six-month suspension was warranted. In addition, the arbitrator stated:

> While ordering reinstatement of the Grievant to a staff nurse position and classification, your Arbitrator is concerned over the two incidents involving the Grievant in February and March of 1995, and again in December 1995. Under these circumstances, while ordering the Hospital to reinstate the Grievant to the staff nurse classification, it is not ordering the Employer to reinstate the Grievant to the ICU/PCU. This is par-

ticularly the case inasmuch as the Grievant has not worked in this unit for ten months while this case was pending.

J.A. at 240–41 (Arb.Decision).

MidMichigan refused to comply with the arbitrator's decision and sought relief from the district court. The court heard testimony from Krantz and from James Hunt, vice president and chief nursing officer at MidMichigan. Hunt's testimony focused on the hospital's inability to place Krantz in a staff nurse position in which she would not have direct responsibility for patient care. Accepting the facts as found by the arbitrator, the district court held that the arbitrator's order violated Michigan's public policy of ensuring the delivery of safe and competent nursing care. In the alternative, the court held that the arbitrator had exceeded his authority under the CBA.

## II.  ANALYSIS

We review the district court's findings of fact for clear error and its conclusions of law de novo. See *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947–48, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 420 (6th Cir.1995). Because the CBA makes the arbitrator's decision "final and binding" on both parties, J.A. at 196(CBA), both we and the district court must defer to the arbitrator's findings of fact and interpretations of the CBA. See *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) ("The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract."). In this case, MidMichigan has accepted the arbitrator's factual findings but claims that his interpretation of the CBA exceeded his authority and that the award violated pub-

lic policy. These are questions of law, which we review de novo.

### A.  INTERPRETATION OF THE CBA

#### 1.  The CBA and MidMichigan's Work Rules

The CBA between MidMichigan and the union contains a section entitled "Management Rights," which states that MidMichigan

retains the right to exclusively and solely manage, operate, and direct the Medical Center ... and to exercise its own discretion on all of the following matters, subject only to such limitations as are expressly set forth in this Agreement. These rights include but are not limited to the following:

. . .

3.  Releasing employees for due cause, lack of work or other legitimate reasons.

. . .

6.  Making, amending and enforcing any reasonable and sensible rules, regulations, and policies necessary to maintain order, safety, propriety, proper action and behavior, and effectiveness in the Medical Center operations.

J.A. at 188(CBA). The CBA also prohibits an arbitrator from making any decision "[c]ontrary to, or inconsistent with or modifying or varying in any way, the terms of this Agreement" and excludes from arbitration

unadjusted grievances which question the exercise of rights set forth in the Article of this Agreement entitled Medical Center Management,[1] or which question the use or application of any right over which the Medical Center is given unilateral discretion in this Agreement. The arbitrator shall limit his/her decision strictly to the interpretation,

---

**1.**  No section of the CBA bears this title. We assume that the parties intended to refer to the section entitled "Management Rights."

application, or enforcement of the provisions of this Agreement.[2]

J.A. at 195(CBA).

As authorized by the CBA, MidMichigan has issued rules governing employee conduct and performance. The rules are divided into two categories, Group I and Group II. Group I violations are relatively minor and result in progressive discipline. They include:

5. Job performance below established standards.

. . .

12. Deliberate or careless conduct endangering the safety of himself/herself or other employees.

13. Failure to use appropriate safety attire as specified or any other violation of a safety rule, procedure, or practice.

J.A. at 311–12 (Rules). Group II violations are more serious and "subject [the employee] to immediate suspension followed by a thorough investigation surrounding the circumstances. [The employee is] subject to discharge if the investigation shows that [he or she] committed the alleged violation." J.A. at 313. Group II violations include:

2. Neglect or abuse of any patient or conduct detrimental to patient care or Hospital operations.

. . .

4. Gross neglect of duty or gross acts of insubordination.

J.A. at 313.

As we have mentioned, Krantz's discharge notice referred to "Gross neglect of duty," an apparent reference to Rule II–4.[3] Because the notice also referred to "jeopardiz[ing] the lives and safety of a patient and fellow employees," it appears that the discharge was premised on the view of the facts rejected by the arbitrator: that Krantz actually attempted to defibrillate the patient while other hospital employees were touching the bed. At arbitration and in these proceedings, MidMichigan has accepted the arbitrator's factual findings and defended Krantz's discharge under Rule II–2, "Neglect or abuse of any patient or conduct detrimental to patient care."

## 2. The Arbitrator's Interpretation

██ "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *Misco,* 484 U.S. at 37–38, 108 S.Ct. 364. The arbitrator's decision is binding on the parties "so long as it draws its essence from the collective bargaining agreement." *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). On numerous occasions we have explained that

[a]n award fails to derive its essence from the agreement when (1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on "general considerations of fairness and equity" instead of the exact terms of the agreement.

*Dallas & Mavis Forwarding Co. v. General Drivers, Local Union No. 89,* 972 F.2d 129, 134 (6th Cir.1992) (quoting *Cement Divs., Nat'l Gypsum Co. v. United Steelworkers,* 793 F.2d 759, 766 (6th Cir.1986)), cert. denied, 506 U.S. 1051, 113 S.Ct. 973, 122 L.Ed.2d 128 (1993). However, "as long as the arbitrator is even arguably . . . acting within the scope of his authority,

---

2. Although this provision possibly could be read to render MidMichigan's interpretation and enforcement of its work rules nonarbitrable, MidMichigan apparently agreed to submit to arbitration the question of whether Krantz's conduct violated a certain work rule.

See J.A. at 251, 254 (MidMichigan Br. to Arb.).

3. Because the rules in Groups I and II are numbered separately, we will refer to them in this style to avoid confusion.

that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco,* 484 U.S. at 38, 108 S.Ct. 364.

■ The arbitrator in this case found that Krantz's conduct was negligent but "did not amount to gross negligence as is contended by the Employer." J.A. at 237 (Arb.Decision). He appeared to believe that Krantz had violated Rule I–5, "Job performance below established standards," rather than any of the Group II Rules. MidMichigan contends that having found that Krantz was "negligent," the arbitrator was obliged to find that Krantz had violated Rule II–2, which refers to "[n]eglect." He avoided doing so, says MidMichigan, only by erroneously imposing a heightened standard of "gross negligence."

We conclude that the arbitrator was well within his authority when he concluded that, under the CBA and the work rules, Krantz had committed only a Group I violation. MidMichigan points out that the arbitrator found Krantz "negligent" and argues that this finding required the conclusion that Krantz had committed a Group II violation. We disagree. The arbitrator's conclusion that ordinary negligence is not a Group II violation is entirely sensible. Contrary to MidMichigan's contention, ordinary negligence in caring for a patient is not necessarily "[n]eglect or abuse" of a patient in violation of Rule II–2. The ordinary negligence of an employee

also could fall within several of the Group I rules, such as Rule I–5, "Job performance below established standards"; Rule I–12, "Deliberate or careless conduct endangering [an employee]"; or Rule I–13, "Failure [to follow] a safety rule."

■ There are two possible readings of the arbitrator's analysis of the difference between Group I and Group II rules. One is that the arbitrator borrowed the concept of "gross" negligence from Rule II–4 in order to guide his interpretation of Rule II–2. The other is that he found Rule II–2 inapplicable and so went on to consider Rule II–4 as well. Either approach would be a reasonable attempt to differentiate between the two types of violations while remaining true to the language of each rule.[4] It is certainly reasonable to conclude that a rule sanctioning "[n]eglect or abuse of any patient or conduct detrimental to patient care or Hospital operations" is not intended to cover acts of ordinary negligence. "Neglect or abuse" of a patient could easily be understood as referring to conscious disregard of the patient's needs or, with respect to "abuse," affirmative acts intended to cause harm. Because the arbitrator's interpretation was reasonable, drawn from the terms of the parties' agreement, and faithful to MidMichigan's work rules, the district court should not have set it aside.[5]

4. It is not grounds to set aside the award that we are unsure which line of reasoning the arbitrator followed. See *Enterprise Wheel,* 363 U.S. at 598, 80 S.Ct. 1358 ("A mere ambiguity in the opinion accompanying an award ... is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award.").

5. Because the arbitrator did not find a violation of a Group II rule nor facts that clearly constitute a violation of a Group II rule, we need not consider whether, under this particular CBA, such a finding would have precluded the arbitrator from awarding reinstatement. Compare *International Bhd. of Elec. Workers, Local 429 v. Toshiba America, Inc.,* 879 F.2d 208, 209–10 (6th Cir.1989) (holding

that CBA precluded arbitrator from altering discipline imposed on employees who violated no-strike clause) with *Dixie Warehouse & Cartage Co. v. General Drivers, Local Union No. 89,* 898 F.2d 507, 511 (6th Cir.1990) (no contractual provision precluded arbitrator from modifying employer's discipline); *Eberhard Foods, Inc. v. Handy,* 868 F.2d 890, 892 (6th Cir.1989) (same). See also *IMC–Agrico Co. v. International Chem. Workers Council of the United Food and Commercial Workers Union,* 171 F.3d 1322, 1327–28 (11th Cir.1999) (comparing cases in which CBA provisions permitting termination for just cause did and did not give arbitrator authority to consider appropriateness of discharge after finding just cause).

### 3. The Arbitrator's Remedy

MidMichigan's most curious argument is that the arbitrator exceeded his authority by "ordering MidMichigan to reinstate Ms. Krantz to a non-patient care position." MidMichigan Br. at 37. MidMichigan states that all of its union jobs involve patient care and claims that the arbitrator would force it to create a new position for Krantz or "bump" an employee from a non-union job. This argument has no basis whatsoever in the arbitrator's decision. The arbitrator held that MidMichigan violated its contract with the union when it fired Krantz. He ordered that she be reinstated. Out of deference to MidMichigan's managerial prerogatives, he did not order that she be reinstated to the same department. As MidMichigan itself has pointed out, the ICU/PCU patients are among the most seriously ill in the hospital. It is reasonable to infer that working in that department is especially demanding. In light of Krantz's previous errors, and in light of the fact that she has not been able to practice her skills since she was fired, the arbitrator recognized MidMichigan's right to control Krantz's work assignments. There is nothing in the arbitrator's opinion to suggest that Krantz may not or should not be assigned to positions involving patient care, including positions that involve emergency response and administration of intravenous medication.

### B. PUBLIC POLICY

The arbitrator having properly found that the parties' agreement does not permit discharge in this case, Krantz is entitled to reinstatement under the CBA. However, courts will not enforce a contract that they independently determine to be contrary to public policy. See *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). MidMichigan contends that, as interpreted by the arbitrator, this is such a contract.

"[W]hen an arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, taking the facts as found by the arbitrator." *Board of County Comm'rs v. L. Robert Kimball & Assocs.*, 860 F.2d 683, 686 (6th Cir.1988), cert. denied, 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 617 (1990). The public policy must "be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. 2177 (quoting *Muschany v. United States*, 324 U.S. 49, 65 S.Ct. 442, 89 L.Ed. 744 (1945)).

It is uncontested that Michigan has a "well-defined and dominant" policy of ensuring safe and competent nursing care. See generally *Russell Mem'l Hosp. Ass'n v. United Steelworkers*, 720 F.Supp. 583, 585–86 (E.D.Mich.1989) (citing Michigan statutes that establish this policy). The question before us is whether requiring a hospital to reinstate a nurse who was found by an arbitrator to have been negligent violates that policy. See *Interstate Brands Corp., Butternut Bread Div. v. Chauffeurs Local Union No. 135*, 909 F.2d 885, 893 (6th Cir.1990), cert. denied, 499 U.S. 905, 111 S.Ct. 1104, 113 L.Ed.2d 214 (1991) (holding that the relevant question is not whether the grievant's conduct violated public policy, but whether award of reinstatement does so).

Even highly skilled professionals err on occasion, and we think it clear that it cannot violate the public policy of Michigan to contract to retain a nurse guilty of committing some acts of carelessness. On the other hand, a hospital should not retain an employee who makes frequent, life-threatening errors, and a CBA that requires it to do so would violate public policy.

We are in a poor position to evaluate the seriousness of Krantz's errors. MidMichi-

gan, however, has attempted to differentiate between relatively minor and major offenses. Under the MidMichigan Rules of Conduct, an employee who is found to have committed three or fewer minor infractions (Group I) within twelve months is subject to suspension but not discharge. "[C]areless conduct endangering the safety of himself/herself or other employees," i.e., simple negligence, constitutes a Group I violation. The commission of a major infraction (Group II), such as "[g]ross neglect" or "[n]eglect or abuse of any patient," subjects the employee to discharge. We believe that this structure, which permits the continued employment of nurses who have committed isolated acts of negligence, is in accordance with the public policy of Michigan.

The arbitrator determined that the Zoll Monitor incident constituted an act of negligence, but did not constitute a Group II violation. This determination turned on the arbitrator's factual finding that Krantz was confused and slow in charging the device but had not attempted to discharge the unit without calling "clear." MidMichigan disputes the characterization of this event as a Group I violation, but it also disputes the facts, which we must accept as correct. Accepting the facts as found by the arbitrator, we conclude that the Zoll Monitor incident, although serious, was properly classified as a Group I infraction. We conclude further that the arbitrator's award of reinstatement based on his factual findings related to Krantz's three infractions does not violate Michigan public policy.

Two other considerations reinforce our view that the arbitrator's award must be upheld. First, the arbitrator noted that Krantz appeared to be "a conscientious, qualified registered nurse who can carry on her duties and classification." J.A. at 241 (Arb.Decision). This assessment, combined with the arbitrator's finding that the Zoll Monitor incident was less serious than MidMichigan purported, distinguishes this case from several cases involving grossly

negligent, reckless, or willful safety violations in which an arbitrator's award of reinstatement has been overturned as violative of public policy. See, e.g., *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 665, 671–74 (11th Cir.1988), cert. denied, 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989) (vacating reinstatement of pilot who was found to have flown commercial plane while intoxicated); *Iowa Elec. Light & Power Co. v. Local Union 204 of Int'l Bhd. of Elec. Workers*, 834 F.2d 1424, 1427–30 (8th Cir.1987) (vacating award of reinstatement of nuclear power plant employee who had deliberately violated important safety regulation); *Russell Mem'l Hosp. Ass'n*, 720 F.Supp. at 587 (vacating reinstatement award of nurse who had been both negligent and insubordinate and who "had a propensity for misconduct" and "was reluctant to change her ways").

Second, recognizing the seriousness of the infractions and the time that had elapsed since Krantz was discharged, the arbitrator did not order MidMichigan to reinstate Krantz in the ICU/PCU. Under the arbitrator's order, MidMichigan has the flexibility to place Krantz in any position in the hospital within her classification and to provide whatever training it deems appropriate. MidMichigan argues that all nursing positions in the hospital involve direct patient care, and we accept this as true. As noted above, however, we are not persuaded that each unit of the hospital is as demanding as the ICU/PCU.

MidMichigan asserts that the reinstatement award also implicates Michigan's policy of holding employers liable for the negligence of their employees. It is true that Michigan hospitals, like other employers, may be vicariously liable for employee negligence, see, e.g., *Kambas v. St. Joseph's Mercy Hosp.*, 389 Mich. 249, 205 N.W.2d 431, 435 (1973), but this does not imply that a CBA that dictates suspension rather than discharge after isolated acts of negligence is violative of public policy. In negotiating a CBA, an employ-

er must weigh potential liability costs, vicarious or direct, against the other costs and benefits of the bargain. As far as we are aware, nothing precludes a hospital from negotiating a CBA that gives management an exclusive, nonarbitrable right to discharge an employee that it finds, in its sole discretion, to have been negligent or to be incompetent. MidMichigan does not argue that it has done so in this instance.

We conclude that it is not against the established public policy of Michigan to require a hospital to reinstate a nurse who has committed isolated acts of negligence. Thus, the CBA in this case, which so requires, is valid, and the arbitrator's award of reinstatement will not be overturned on public policy grounds.

### III. CONCLUSION

Because the arbitrator's award drew its essence from the parties' agreement and is not contrary to public policy, we **REVERSE** the district court's decision and **REMAND** with instructions to reinstate the award.