**MICHIGAN FAMILY RESOURCES, INC., Plaintiff/Counter–Defendant,**

v.

**SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL NO. 517M, Defendant/Counter–Plaintiff.**

No. 1:04–CV–19.

United States District Court,
W.D. Michigan,
Southern Division.

Nov. 10, 2004.

Timothy J. Ryan, Miller Johnson Snell & Cummiskey PLC, Grand Rapids, MI, for Plaintiff/Counter–Defendant.

Howard F. Gordon, Service Employees International Union, Lansing, MI, for Defendant/Counter–Plaintiff.

## *OPINION*

QUIST, District Judge.

Plaintiff, Michigan Family Resources, Inc. ("MFR"), filed a complaint against Defendant, Service Employees International Union Local No. 517M (the "Union"), seeking vacation of an arbitration award rendered on December 10, 2003. The Union has filed a counter-complaint seeking to enforce the arbitration award. Now before the Court is MFR's motion for summary judgment. For the reasons set forth below, the Court concludes that MFR's motion should be granted and the award vacated.

## I. *Background and Procedural History*

### A. **The Collective Bargaining Agreement**

MFR is a non-profit corporation which operates the Federal Headstart Program for Kent County. The Union represents some of MFR's employees. MFR and the Union are parties to a collective bargaining agreement covering the period from June 1, 2001, to May 31, 2005 (the "CBA"). The CBA provides that, among other things, bargaining unit members are entitled to certain wage increases. In particular, Article 35 of the CBA provides, in relevant part:

> Bargaining unit members will receive wage increases as follows:
>
> 1. Bargaining unit members will receive the same cost of living increases paid to other MFR employees pursuant to the directive of MFR's funding source. The parties understand that the timing and amount of any such increase is entirely dictated by the funding source.
>
> 2. During the fall semester of each program year, bargaining unit members will be reviewed and will be considered for a merit increase. Merit increases will be made effective as of the date the employee is called back to work at the start of the program year. For twelve month employees, the merit increase will be effective as of August 15 of each year. MFR will guarantee at least that for each bargaining unit employee the sum of any COLA paid during the year and the merit increase will be as follows: 2002—4%; 2003—2½%; 2004—3½%. For example, if the COLA increase for 2004 is 2.5%, effective on September 1, 2004 bargaining unit members will receive at least an additional 1.0%.

(CBA Art. 35, §§ 1, 2.) The federal government is the funding source referred to in Section 1 of Article 25.

The CBA contains a grievance procedure for disputes under the CBA, which provides for binding arbitration as the final step in the process. (*Id.* Art. 5.) The grievance procedure defines the scope of the arbitrator's authority as follows:

The arbitrator shall have full authority to convene a hearing and require the parties to submit briefs. The arbitrator shall have full authority to render a decision which shall be final and binding upon both parties and the employees, except that the arbitrator shall not have authority to change, alter, amend, or deviate from the terms of this collective bargaining agreement in any respect. The parties shall each pay one half the cost of the Arbitrator.

(*Id.* Art. 5(c).)

Finally, the CBA contains a waiver provision, which states in relevant part:

MFR and the Union acknowledge that all the agreements arrived at by them during the negotiations, concluded by this agreement, are set forth herein. This Agreement expresses the understanding of the parties and it will not be changed, modified, or varied, except by written instrument signed by duly authorized agents of the party hereto. There are no past practices which are binding upon the parties . . . .

(*Id.* Art. 34.)

## B. The Grievance and Arbitration

On or about May 13, 2003, John Barr, MFR's human resources manager, issued a memo to bargaining unit employees notifying them that the wage increase for 2003 was 2.5% as provided in the CBA. The memo stated that the COLA increase specified by the funding source for 2003 was 1.5% and that that amount would be paid retroactive to January 1. The memo also stated that the additional 1% required by the CBA would be paid to employees in September when they returned to work. The Union filed a grievance, claiming that MFR was in violation of the CBA because MFR gave its non-Union employees a 4% increase and the CBA required COLA parity between Union and non-Union employees.

The parties submitted the grievance to arbitration before Arbitrator Mark J. Glazer on September 22, 2003. The issue presented to the Arbitrator was whether Article 35 requires that Union employees receive the same COLA as non-Union employees.

The Arbitrator issued his opinion and award on December 10, 2003, and concluded that Union employees were entitled to the same COLA provided to non-Union employees. In reaching his decision, the Arbitrator noted that for 2002, after the Union filed a grievance, MFR agreed to provide Union employees the same 4% COLA paid to non-Union employees effective January 7, 2002. (Op. & Award at 6.) The memorandum issued by MFR to describe the settlement said: "For employees covered by the SEIU contract, on a one-time non-precedent setting basis, the 4% COLA will be included with the paychecks issued January 25, 2002, rather than the start of the program year August 15, 2002." (*Id.* at 7.) The Arbitrator found that the 2002 4% COLA included a 2.5% COLA from the federal funding source and an additional 1.5% from MFR. The Arbitrator also found that MFR treated the additional 1.5% as a COLA. (*Id.* at 6.) The Arbitrator determined that Section 1 of Article 35, which refers only to COLA paid by the federal government, was ambiguous in light of MFR's prior decision to treat the entire 4% paid pursuant to the CBA as a COLA and, therefore, it was appropriate to consider evidence of the parties' past practice to determine their intent. (*Id.* at 8.) Based upon the evidence of past practice, the Arbitrator concluded that COLA parity was required. As additional support for his conclusion, the Arbitrator cited the example in the last sentence of Article 35, Section 2, which he interpreted as meaning that Union employers could receive more than the stipulated minimum payments set forth in Section 2. (*Id.* at 9.)

## II. Standard of Review for Arbitration Awards

The standard for review of arbitration awards is "one of the narrowest standards of judicial review in all of American jurisprudence." *Tenn. Valley Auth. v. Tenn. Valley Trades & Labor Council,* 184 F.3d 510, 514–15 (6th Cir.1999) (quoting *Lattimer–Stevens Co. v. United Steelworkers of Am., Dis. 27,* 913 F.2d 1166, 1169 (6th Cir.1990)) (internal quotation marks omitted). In reviewing an award, a court's scope of review is limited to determining whether "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987). So long as the arbitrator's award "draws its essence from the collective bargaining agreement" and is not merely the arbitrator's "own brand of industrial justice," the award must be upheld. *Id.* at 36, 108 S.Ct. at 370 (internal quotations omitted).

> [T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns [a] construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*United Steelworkers of Am. v. Enter. Wheel & Car Co.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). Thus, while an arbitrator is accorded wide latitude in construing a collective bargaining agreement, the arbitrator's interpretation and award must be grounded in the language of the contract. *Misco,* 484 U.S. at 38, 108 S.Ct. at 371. The Sixth Circuit has held that an arbitrator's award fails to draw its essence from the collective bargaining agreement when:

> "(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on general considerations of fairness and equity instead of the exact terms of the agreement."

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Dana Corp.,* 278 F.3d 548, 554 (6th Cir.2002) (quoting *MidMichigan Reg'l Med. Ctr. - Clare v. Prof'l Employees Div. of Local 79,* 183 F.3d 497, 502 (6th Cir.1999)).

## III. Discussion

MFR contends that the Court should vacate the Arbitrator's award because it fails to draw its essence from the CBA. MFR notes that the Arbitrator found that the pertinent language was ambiguous only after he considered evidence of MFR's prior conduct regarding the 2002 wage increase. MFR points out that the CBA says only that bargaining unit employees are to receive a 2.5% increase for 2004 and says nothing about parity with non-bargaining unit employees. Thus, MFR contends, the Arbitrator improperly created ambiguity where none existed and failed to properly apply the unambiguous terms of the CBA.

The Union agrees with MFR that the language of Article 35 is unambiguous, but it contends that the Arbitrator's decision is supported by and consistent with the provisions of the CBA. The Union's position is simple: "The clear and unambiguous language of Article 35: Wages, establishes an incontrovertible formula that unequivocally 'guarantees' that each bargaining unit member will be paid the sum of **any** COLA paid during the year plus the merit increase which must equal **at least** 2.5% in 2003." (Def.'s Br. Opp'n at 2.) According

to the Union, MFR failed to comply with Article 35, Section 2 of the CBA because the COLA paid to non-Union employees was 1.5% greater than the COLA paid to Union employees and, therefore, the Union employees did not receive the "sum of any COLA" paid during 2003.

 Having reviewed the relevant provisions of the CBA, the Court agrees with both parties on one indisputable point: the provisions of Article 35 regarding wages are clear and unambiguous. On this basis, the Arbitrator improperly considered evidence pertaining to the 2002 wage dispute. The Sixth Circuit has held that parol evidence relating to construction of the contract may be considered only where the contract is ambiguous: "[W]here the meaning of the clause in question is clear, no construction is necessary." *Local 783, Allied Indus. Workers of Am. v. Gen. Elec. Co.*, 471 F.2d 751, 756–57 (6th Cir.1973); *see also Excel Corp. v. United Food & Commercial Workers Int'l Union*, 102 F.3d 1464, 1468 (8th Cir. 1996) ("The arbitrator's reliance on parol evidence was erroneous because the plain language in the applicable portions of the CBA is clear and unambiguous. Although an arbitrator's award is given great deference by a reviewing court, the arbitrator is not free to ignore or abandon the plain language of the CBA, which would in effect amend or alter the agreement without authority."). In this case, the Arbitrator's award does not draw its essence from the CBA because the Arbitrator considered evidence to aid in construing the CBA when, in fact, no construction was necessary. Moreover, in doing so, the Arbitrator went beyond the express terms of the CBA by imposing additional requirements upon the parties and considering past practices, which are specifically disclaimed by the CBA's waiver provision.

Given the lack of ambiguity, the application of Article 35 to the dispute in this case is straightforward. Section 1 states that the COLA paid to Union employees will be the same as paid "to other MFR employees pursuant to the directive of MFR's funding source. **The parties understand that the timing and amount of any such increase is entirely dictated by the funding source.**" (CBA Art. 35, § 1 (emphasis added).) This language sets forth a specific and readily determinable COLA which, by its very terms, eliminates any other definition of COLA. Thus, both MFR and Union employees understand that the COLA portion of any wage increase will be determined by the federal funding source. Applying this section to the instant dispute, MFR properly determined that the COLA for 2003 was 1.5% as specified by the funding source.

Section 2 does not alter the language of Section 1. Rather, it sets forth the procedure and timing for merit increases, if any, as well as the guaranteed minimum combined COLA and merit increase amounts for years 2002 through 2004. The example in the last paragraph explains the operation of Sections 1 and 2: "For example, if the COLA increase for 2004 is 2.5%, effective on September 1, 2004 bargaining unit members will receive at least an additional 1.0%." The 2.5% COLA is determined pursuant to Section 1 and, because MFR agreed to a minimum combined 3.5% increase, the remaining 1% represents a merit increase. Section 2 leaves open the possibility of a larger merit increase if MFR determines it to be appropriate, but it also leaves open the possibility of no merit increase. For example, if the COLA for 2004 were 3.5% and MFR decided not to award a separate merit increase, the entire 3.5% increase would be considered a COLA and there would be no separate merit increase. On the other hand, if the funding source determined that the COLA for 2004 was 5%, Union members would be entitled to more than the stipulated amount for 2004. Applying this section to

the instant dispute, the Court must conclude that MFR properly determined that Union employees were entitled to an additional 1% increase as a merit increase. Moreover, MFR properly rejected the Union's demand for a 4% COLA because Sections 1 and 2 limit MFR's obligation to a 1.5% COLA in this situation, and nothing in Article 35 requires MFR to pay more than this amount.

As noted above, the Union's argument is that the language "any COLA" means that MFR is required to pay Union employees the same COLA it pays to non-Union employees. This argument fails because it reads Section 1, which states that the "amount of any such [COLA] increase is entirely dictated by the funding source," completely out of the contract. Furthermore, taken literally, the Union's interpretation would mean that MFR could consider "any COLA" paid by any employer, governmental program, or other source located anywhere in the world because that language is not limited to a COLA paid to MFR non-Union employees. The Union's interpretation could easily prove to be a double edged sword, because if the funding source specified a 5% COLA for 2004, MFR could shirk its obligation to pay the 5% COLA under Section 1 merely by showing that someone somewhere in the world paid a COLA of less than 5% for 2004. In light of the clear language of Article 35, the Court seriously doubts that the parties intended such an absurd result.

### IV. *Conclusion*

For the foregoing reasons, the Court will grant MFR's motion for summary judgment and vacate the arbitration award.

An Order consistent with this Opinion will be entered.